In re Norma Jane CRUTCHER, Debtor.

AT & T UNIVERSAL CARD
SERVICES, Plaintiff,

v.

Norma Jane CRUTCHER, Defendant.

Bankruptcy No. 96–23556.
Adversary No. 96–0593.

United States Bankruptcy Court,
W.D. Tennessee,
Western Division.

Aug. 11, 1997.

---

David L. Mendelson, Memphis, TN, for Plaintiff.

William A. Cohn, Cordova, TN, for Defendant.

## MEMORANDUM OPINION AND ORDER RE COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND CREDITOR'S MOTION FOR SANCTIONS

G. HARVEY BOSWELL, Bankruptcy Judge.

It is an uncontroverted fact that the debtor in this case, Norma Jane Crutcher, suffers from a severe gambling addiction. Over a period of ten (10) days in April 1995, Crutcher used her AT & T Universal MasterCard to obtain over $11,000.00 in cash advances at various casinos in Tunica, Mississippi. Upon filing her chapter 7 bankruptcy petition, AT & T Universal Card Services filed this adversary proceeding seeking to declare the outstanding debt nondischargeable under 11 U.S.C. § 523(a)(2)(A). Such section bars the discharge of debts which were fraudulently incurred.

This Court conducted a trial on this matter on June 17, 1997, pursuant to FED. R. BANKR. P. 7001. This is a core proceeding. 28 U.S.C. § 152(b)(2). After reviewing the testimony from the trial and reviewing the record as a whole, the Court makes the following findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

## I. FINDINGS OF FACT

The facts in this case are essentially undisputed. The debtor, Norma Jane Crutcher ("Crutcher"), is a self-admitted addicted gambler. Over a period of two years, Crutcher gambled away thousands of dollars at various casinos in Tunica, Mississippi, mainly at the $25.00 slot machines. Crutcher was both successful and unsuccessful in her gambling endeavors. In 1994, she hit a jackpot of $134,000.00 on one machine. In describing her gambling experiences, Crutcher testified "I know you can win and I know you can lose. I know you can do both."

Not surprisingly, Crutcher's gambling addiction drained her family's finances. So bad was her habit, that after she had spent all the money in her and her husband's bank accounts, she turned to the cash advance privileges of her credit cards to fund her addiction. Over a period of approximately two years, Crutcher ran up large balances on her AT & T Universal MasterCard, Account # 5398–7000–1051–5025, which she eventually paid off by refinancing her family's house several times. In February 1995, Crutcher's outstanding balance on her AT & T MasterCard was $11,600.00. On February 23, 1995, Crutcher called AT & T to inform them she was considering filing a chapter 13 bankruptcy petition. Despite this professed intention, Crutcher was able to pay off the entire balance of her card by refinancing her house once again. On April, 7, 1995, Crutcher sent AT & T a check for $11,600.00 which had the effect of reducing the balance on her MasterCard to $0.00.

Upon paying her MasterCard bill in full, Crutcher informed AT & T that she was an addicted gambler and requested that AT & T close her account and not reopen it under any circumstances. On April 11, 1995, however, Crutcher found herself in the unfortunate situation of owing a casino $2500.00. Faced with the prospect of going to jail unless the money was repaid, Crutcher phoned AT & T and sought an emergency cash withdrawal of $2500.00. AT & T approved this transaction and charged the $2500.00 to the debtor's MasterCard account.

With her AT & T account now reactivated, Crutcher used the cash advance privileges of her MasterCard to go on a gambling spree in late April of 1995. Within a 24-hour period, the following cash advances were taken by Crutcher on her MasterCard:

| | | |
|---|---|---|
| April 20, 1995 | $ 402.00 | Circus Circus Casino |
| April 21, 1995 | $ 521.99 | Circus Circus Casino |
| April 21, 1995 | $ 521.99 | Horseshoe Casino |
| April 21, 1995 | $1041.99 | Circus Circus Casino |
| April 21, 1995 | $1041.99 | Circus Circus Casino |
| April 21, 1995 | $1041.99 | Circus Circus Casino |
| April 21, 1995 | $1041.99 | Circus Circus Casino |
| April 21, 1995 | $1041.99 | Horseshoe Casino |
| April 21, 1995 | $1559.99 | Horseshoe Casino |

In addition to the $2500.00 emergency cash withdrawal and various finance charges, these cash advances raised the outstanding balance on Crutcher's MasterCard to $11,885.75. This balance exceeded the credit limit on Crutcher's account by over $2000.00. Crutcher has made no payments towards this balance, nor have any subsequent charges or cash advances been made on this card since April 21, 1995.

Following a violent episode with her husband in May of 1995 and talks of suicide, Crutcher was admitted to Charter Lakeside Hospital for a psychiatric evaluation. On May 25, 1997, Crutcher was evaluated by Dr. Rickey Carson, an addiction medicine and psychiatric medicine specialist.[1] Dr. Carson diagnosed Crutcher as a pathological gambler suffering from major depression with signs of manic depression. Pathological gambling was described by Dr. Carson as "simply out of control gambling with illogical, compulsive, irrational gambling behavior." During the time Crutcher was in Charter Lakeside, a physical examination was also conducted which determined that Crutcher was suffering from severe diabetes mellitus that was insulin dependent with very poor control. Crutcher only occasionally took her insulin and did not adhere to a strict diet to regulate her condition.

Eleven months after her gambling spree, Crutcher filed a chapter 7 petition on March 19, 1996, seeking the protection of the bank-

---

1. Dr. Carson is certified by the American Society of Addiction Medicine as an addiction medicine specialist.

ruptcy system. Displeased with the prospect of having their debt discharged, AT & T filed this adversary proceeding on June 3, 1996. In their complaint, AT & T alleged that the cash advances taken by Crutcher on her MasterCard account were incurred fraudulently and sought to have such debt declared nondischargeable under 11 U.S.C. § 523(a)(2)(A).

## II. CONCLUSIONS OF LAW

Increasingly, credit card companies are turning to 11 U.S.C. § 523(a)(2)(A) in hopes of excepting credit card debts from the bankruptcy discharge. Such section provides that:

> (a) A discharge under section 727, 1141, 1228[a] 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>
> > (2) for money, property, services, an extension, renewal, or refinancing of credit, to the extent obtained, by—
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). The terms "false pretenses," "false representation" and "actual fraud" are not defined by the Bankruptcy Code. As a result, courts have had the responsibility for setting their boundaries. In the case of *Field v. Mans,* the U.S. Supreme Court held that the terms used in § 523(a)(2)(A):

> ... carry the acquired meaning of terms of art. They are common law terms, and in the case of "actual fraud," ... they imply elements that the common law has defined them to include.

*Field,* 516 U.S. 59, 69, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995).

In following the Supreme Court mandate announced in *Field v. Mans,* all courts have unanimously held that, as used in § 523(a)(2)(A), [a]ctual fraud involves moral turpitude and does not include fraud implied in law which may exist without imputation of "bad faith or intentional wrong." *In re Pommerer,* 10 B.R. 935 939 (Bankr.D.Minn.1981). For a creditor to succeed in excepting a debt

from discharge, the debtor must have engaged in some conduct which can be fairly said to be "blameworthy." *In re Anderson* 181 B.R. 943, 948 (Bankr.D.Minn.1995) If a creditor is unable to show that the debtor acted with a deliberate intent to deceive, he will be unsuccessful in his claim.

In addition to agreeing on what type of fraudulent behavior § 523(a)(2)(A) covers, courts are also unanimous in the procedural aspects of such an action. First, the party asking for the exception to discharge bears the burden of proof in a § 523(a)(2)(A) cause of action. *In re Martin,* 698 F.2d 883, 887 (7th Cir.1983). Secondly, exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. *In re Zarzynski,* 771 F.2d 304, 306 (7th Cir.1985). Thirdly, all courts agree that the burden of proof on the objecting creditor is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). These approaches have received widespread acceptance from courts because they are thought to further the well-espoused bankruptcy policy of granting the honest, but unfortunate debtor a fresh start in bankruptcy. *In re Balzano,* 127 B.R. 524, 529 (Bankr.E.D.N.Y. 1991); *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934).

Another well-settled area of § 523(a)(2)(A) law concerns the elements of proof that a claim for an exception to discharge includes. In order to have a debt declared nondischargeable pursuant to this section, the creditor must prove (1) the debtor made a material representation, (2) the debtor knew the representation was false at the time of making it, or made the representation with gross recklessness as to the truth, (3) the debtor made the representation with the intention of deceiving the creditor, (4) the creditor justifiably relied upon such representation, and (5) the creditor sustained loss and damage as the proximate result of the representations. *In re McLaren,* 3 F.3d 958 (6th Cir.1993), *Field,* 516 U.S. at 74–76, 116 S.Ct. at 446.

Although the courts have come to a great deal of consensus on how to evaluate a

§ 523(a)(2)(A) cause of action, there has been little agreement on how to analyze the second prong of such inquiry, that of the falsity of the representation. Currently, there are two main approaches, to determining whether or not the debtor fraudulently represented his intent regarding repayment of the debt.[2] These theories are known as the "Totality of the Circumstances" approach and the "Common Law/Subjective" approach

### A. The "Totality of the Circumstances" Theory

The first theory, and the one the plaintiff urges this court to use, is the "Totality of the Circumstances" approach. This theory employs a rather elaborate test to determine whether or not the debtor possessed a fraudulent intent at the time of making a purchase. This determination is made by looking to the facts and circumstances surrounding the case and analyzing them under a laundry list of objective factors. These criteria include:

1. The length of time between the charges and the filing of the bankruptcy petition.

2. The number of charges made.

3. The amount of the charges.

4. Whether charges were above the credit limit on the account.

5. Whether there exists a sharp change in the debtor's buying habits.

6. Whether the charges were made in multiples of three or four per day.

7. Whether the charges were below the $50 floor limit.

8. Whether the debtor was hopelessly insolvent at the time the charges were made.

9. Whether an attorney had been consulted about bankruptcy before the charges were made.

10. The debtor's employment circumstances.

11. The debtor's prospects for employment.

12. Whether the purchases were made for luxuries or necessities.

*In re Weiss,* 139 B.R. 928, 930 (Bankr.D.S.D. 1992).

At first glance, it would seem that the debtor in this case did indeed fraudulently incur her credit card debt under this theory. The debtor made nine charges within 24 hours, the charges were above her credit limit; the charges were for gambling—no doubt a luxury; and the debtor was not employed at the time they were incurred. When the other factors are investigated, however, it becomes seemingly less apparent that the debtor was fraudulent. There was almost a one-year gap between the time of the charges and the time of filing the petition. An attorney had not been consulted about bankruptcy before the charges were made. Additionally, these charges were not out of the ordinary for the debtor. She had incurred large cash advances in the past for gambling.

Although a true ability to pay for the charges at the time they are incurred is not one of the listed factors under the "Totality of the Circumstances" approach, courts employing this method of analysis tend to place a lot of weight on it. This is especially true in the context of credit card debts entered into for gambling:

Intent to repay requires some factual underpinnings which lead a person to a degree of certainty that he or she would have the ability to repay. Mere hope or unreal-

2. There are four main approaches to the § 523(a)(2)(A) analysis overall. There is the "Implied representation" theory which holds that use of a credit card impliedly represents both a current intent and ability to repay the debt. *In re Ward,* 857 F.2d 1082 (6th Cir.1988). As a result of this ideology, courts employing this doctrine find the first element of the common law test for fraud by implication. *In re McKinnon,* 192 B.R. 768, 771 (Bankr.N.D.Ala.1996). A second approach to § 523(a)(2)(A) actions is called the "Assumption of the Risk" theory. This doctrine discharges all debts incurred before unequivocal revocation of the debtor's charging privileges is communicated to the debtor. *First Nat'l Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983). This approach has received the least acceptance from and use by the bankruptcy court system as a whole. The other two approaches, the "Totality of the Circumstances" approach and the "Common Law/Subjective" approach, focus solely on the intent of the debtor and are the ones vital to this Court's determination of the case at bar.

istic or speculative sources of income are insufficient.

*In re Nahas,* 181 B.R. 930, 934 (Bankr. S.D.Ind.1994). Typically, gambling is the sort of income which is considered too speculative to give the debtor the intent to repay; however, in the case at bar, the debtor did have some basis for believing to some degree of certainty that she would be able to pay off any debt incurred. Not only had Crutcher won substantial sums of money in the past, she had also been able to refinance her house several times in order to pay off her Master-Card account. This is an instance in which the debtor's hopes of hitting the jackpot were not her only source of income for repayment of debts.

## B. The "Common Law/Subjective" Theory

In response to the objective approach of the "Totality of the Circumstances" analysis, a second theory has arisen which courts use to determine a debtor's intent under § 523(a)(2)(A). This theory is known as the "Common Law/Subjective" approach. In rejecting the purely objective viewpoint of the "Totality" approach, the "Common Law" courts have relied on the mandate *of Field v. Mans,* which held that § 523(a)(2)(A)'s terms are to be interpreted according to the meanings the common law has given them. *Field,* 516 U.S. at 68–70, 116 S.Ct. at 443. In following this mandate and looking to the kind of intent the common law requires in order to prove fraud, the courts using the "Common Law/Subjective" theory held that it is the debtor's "subjective" intent which must be proven. *In re Murphy,* 190 B.R. 327, 333 (Bankr.N.D.Ill.1995). These courts have concluded that the objective-laundry list method of determining intent ignores this requirement:

> Courts often recite lists of factors they supposedly look for when searching for intent to deceive.... The courts then compare the evidence to the list and count matches.... This factor-counting exercise turns the job of fact-finding on its head. What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent. This determination will

require a review of the circumstances of the case at hand, but not a comparison with circumstances (a/k/a "factors") of other cases.

*Id.* at 334

The courts that use this subjective approach do approve of looking to all the facts and circumstances surrounding a case like the objective theory does. However, they feel that limiting the inquiry to only an objective viewpoint can have a drastic impact on the outcome of the case:

> ... [T]he distinction is critical ... A reasonably prudent person would not rely almost entirely on gambling and speculative investments as a basis for a promise to satisfy short term credit obligations ... Such a person would have realized that sooner or later he would lose enough to render him unable to pay those debts. But it is less clear that the debtor had an actual intent to deceive.

*Id.* at 334. Under this approach, the mere fact that the debtor lost his money gambling is not wholly determinative as to the issue of intent. It is a factor to be taken into consideration.

The court in the case of *Anastas v. American Savings Bank,* 94 F.3d 1280 (9th Cir. 1996) used this approach to discharge an extremely large amount of credit card debt incurred through gambling. The *Anastas* court held that even though the debtor had incurred the majority of his credit card debt for gambling purposes, he did have the requisite intent to repay the debt. *Id.* at 1287. In addition to the fact that the debtor had amassed this large debt over a period of six months and had always made his minimum payments, the *Anastas* court relied heavily on the fact that the debtor had a problem with gambling:

> Anastas testified that he always possessed the intent to repay his credit card debts, but that he had a gambling addiction which led him into unexpected financial circumstances.

*Id.* Instead of looking to the fact that a reasonable person would have known that the chances of winning enough money to pay off the insurmountable credit card debt were

slim, the *Anastas* court looked to what this particular debtor believed given the nature of his addiction.

In another case concerning credit card debt incurred to find a debtor's gambling habit, the bankruptcy court once again found the debt dischargeable. In *In re Murphy*, 190 B.R. 327 (Bankr.N.D.Ill.1995), the debtor was a life-long gambling addict who satisfied his love of betting on sports and investing in the stock market by taking advantage of his cash advance privileges on his credit card. For quite some time, the debtor had managed to be lucky enough to repay this growing debt; however, he eventually hit a losing streak that spiraled downward into insolvency. In holding the debt dischargeable, the court found:

> In this case, considering all the circumstances, the Court finds that at the time the Debtor incurred the debts at issue, he intended to repay them and believed (however unreasonably) that he would have the means to do so from his gambling and investments. The debtor had for years successfully relied on such "income" to pay off his credit card debt.... The debtor did not significantly alter his spending habits in the months preceding the filing of his bankruptcy petition; rather, his betting did not come through for him as it had in the past.

*Id.* at 334. The court in *Murphy* did not analyze the situation from an outsider's perspective. Rather, they looked to the surrounding circumstances from the viewpoint of the debtor in front of them and asked themselves what he believed, given the nature of his addiction.

■ This Court finds that, under this approach to § 523(a)(2)(A), Crutcher had the requisite intent to repay her credit card debt at the time she incurred it. She was a diagnosed addicted gambler who had won substantial amounts of money in the past as had the debtors in *Anastas* and *Murphy*. Additionally, when gambling did not provide the necessary funds, Crutcher had always managed to find a way to satisfy her obligations. It was undisputed at trial that she had refinanced her house three or four times in the past for the sole purpose of paying off her AT & T MasterCard account.

Although the reasonable non-addicted gambler may have realized that the chances of hitting a big enough jackpot to pay off the debt were slim or that the option of refinancing a house for the third or fourth time would not exist, it is the debtor's perspective which is vital to the determination of the case at bar. Crutcher believed, in good faith, that she could repay the debt because she had hoped and believed she would hit another jackpot like the one in 1994. The amount of money she spent at Tunica on April 20th and 21st in 1995 was not out of the ordinary for her. The month prior to incurring the debt she had sent AT & T a check for over $11,000.00. Although the known odds of winning on gambling are low, Crutcher had always overcome them before or had faced up to her responsibility for repaying her debt by finding an additional source of money.

## C.  Conclusion

Although this Court agrees that the list of factors used in the "Totality of the Circumstances" approach are helpful to a determination of a § 523(a)(2)(A) action, in the case of addicted gamblers, the factors are not enough by themselves. They must be addressed from a subjective approach, taking all of the surrounding facts and circumstances into consideration, including the reality of the debtor's addiction.

This Court finds today that the debtor, Norma Jane Crutcher, did not possess a fraudulent intent at the time of incurring the charges on her AT & T Universal Master-Card. At all times, Crutcher had a firm basis for believing she could repay her debt. As a result of this holding, this Court finds Crutcher's debt of $11,885.75 to be dischargeable. Because AT & T failed to prove a fraudulent representation on the part of the debtor, there is no reason to consider the other elements of proof of the § 523(a)(2)(A) action, those being the reliance by the creditor upon such representation and the harm suffered.

## III. ORDER

It is therefore **ORDERED** that the debt owed by debtor to the plaintiff in the amount of $11,885.75, is discharged as a result of plaintiff's failure to prove all of the elements required.

**IT IS SO ORDERED.**