In re Donald **REYNOLDS,** Debtor.

**AT & T UNIVERSAL CARD SERVICES CORP., Plaintiff,**

v.

**Donald REYNOLDS, Defendant.**

In re Ira L. **DAWSON,** Debtor.

**AT & T UNIVERSAL CARD SERVICES CORP., Plaintiff,**

v.

**Ira L. DAWSON, Defendant.**

**Bankruptcy Nos. 96–72456–CMS–7, 96–72761–CMS–7. Adversary Nos. 97–70036–CMS–7, 97–70102–CMS–7.**

United States Bankruptcy Court, N.D. Alabama, Western Division.

March 9, 1998.

Annette B. Crain, Tuscaloosa, AL, for Donald L. Reynolds.

W. McCollum Halcomb, Birmingham, AL, for AT & T Universal Card Services Corp.

Robert A. Morgan, Tuscaloosa, AL, Chapter 7 Trustee.

Claude M. Burns, Jr., Tuscaloosa, AL, for Ira L. Dawson.

## MEMORANDUM OF DECISION

C. MICHAEL STILSON, Bankruptcy Judge.

These two matters came before the court on AT & T Universal Card Services Corporation's (hereinafter AT & T) lawsuits against debtors in separate Chapter 7 cases. AT & T sought to have the court declare the debtors' obligations to it nondischargeable in bankruptcy under 11 U.S.C. § 523(a)(2)(A). Separate hearings were held on the cases November 24, 1997.

The legal issue in both cases is the same, so the court has consolidated legal discussion for both in this Memorandum of Decision pursuant to Fed.R.Civ.P. 42 [1] to avoid unnecessary costs or delay. The court has reviewed the facts in the context of applicable law and finds AT & T failed to prove either of these debts should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

### FINDINGS OF FACT: Reynolds

The debtor, Donald Reynolds; and Andrea Ware, employee of AT & T, testified at the November 24, 1997 hearing on this nondischargeability lawsuit. Various written documents related to the Chapter 7 debtor's application for an AT & T credit card and subsequent charges made on the account were also admitted as evidence. The facts are not in dispute. The issue is the application of the law to the facts.

The debtor, Donald Reynolds, has been receiving Social Security disability income since 1991. His attorney described Reynolds' disability as a chemical imbalance of the brain. The debtor receives $840.00 per month in Social Security disability benefits, approximately the income ($10,000.00 per year) he received in 1996 when AT & T issued him the credit card.

AT & T had nevertheless mailed Reynolds a credit card solicitation offering a pre-approved credit line of up to $10,000.00. (Plaintiff's Exhibit 1) AT & T's representa-

---

1. **Fed. R. Bankr.P. 7042** applies Fed.R.Civ.P. 42 to adversary proceedings in bankruptcy. **Fed. R.Civ.P. 42(a)** provides:
 (a) **Consolidation.** When actions involving a *common question of law* or fact are pending before the court, it may order a joint hearing or trial of any or all matters in issue in the actions; it may order all the actions consolidated; and *it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.* (emphasis added)

tive at the hearing indicated she did not know where the company got the debtor's address.

Reynolds completed the forms in the credit card solicitation. He truthfully listed his annual income at $10,000.00, and gave AT & T his Social Security number, date of birth and telephone number. (Plaintiff's Exhibit 1) The debtor testified that he did have roommates at various times who would sometimes pay him $50.00 per week for rent and that he also had other credit cards in addition to AT & T. There was no evidence AT & T inquired about the source of his stated income, his past credit history or his ability to repay credit card obligations.

In January of 1996, AT & T issued Reynolds a credit card with a $5,000.00 credit line (one-half of debtor's annual income from Social Security disability). February 6, 1996, the debtor began using the credit card, as shown by Plaintiff's Exhibit 2. The debtor obtained a $600.00 cash advance on the card at First State Bank of Tuscaloosa on February 6, 1996 and made purchases totaling $513.73 that same day. By February 20, 1996, the credit card had already been "maxed out" and was, in fact, over the $5,000.00 credit limit by approximately $200.00.

Ms. Ware, testifying for AT & T, said that on February 13, 1996, a week before the "max out", AT & T had reviewed Reynolds' account because of the unusual activity. However, she said the review was only to determine if the credit card had been stolen. A review of the charges did not suggest the card had been stolen, she said, so no contact was made with the debtor at that point.

AT & T's witness also said that the account had a "pad" built into it which allowed a debtor to exceed his/her credit limit by a certain, small predetermined amount without action by AT & T. That is what happened in the Reynolds case. While the debtor said he made most of the charges on the credit card, he did testify his girlfriend also made some charges with his authorization. February activity in the account included purchases totaling $1,647.82; and cash advances totaling $3,524.00.

There was no evidence of attempted activity in the account after February. After that one month, AT & T's minimum payment was $327.04, more than a third of his monthly net income. Reynolds made no payments on this account prior to filing his bankruptcy petition.

That first payment on the account was due March 23, 1996. When AT & T received no payment, on April 3, 1996 it attempted to contact Reynolds for the first time. Ms. Ware testified that the creditor's records showed that AT & T was successful in contacting the debtor April 18, 1996. At that time, he advised AT & T that he was on disability, was unable to pay the account balance, and did not know how or when he might be able to pay in the future. He stated that he needed the money. (Plaintiff's Exhibit 4)

When AT & T again contacted Reynolds on May 21, 1996, he stated that he was filing Chapter 7 bankruptcy, Ms. Ware said. He identified his current bankruptcy attorney, although he said he had not then paid a retainer fee. Court records show that the bankruptcy petition was filed October 28, 1996.

The debtor testified that his income and expenses were approximately the same at the time AT & T approved his credit card application as they were when he filed his bankruptcy petition. He stated that he was "doing good" if he had $25.00 left after paying monthly expenses. Schedules I and J of the bankruptcy file reflect $840.00 per month income and $840.00 per month expenses. Ms. Ware testified she did not know if AT & T had run a credit check on the debtor or had checked his income prior to issuing the credit card. It is not disputed that Reynolds accurately disclosed on his application that he had only $10,000.00 per year in income before AT & T issued him the card with the $5,000.00 line of credit.

The debtor's Schedule F (unsecured debt) lists the AT & T account with a balance of $5,217.00 (however, the balance due at filing, according to Ms. Ware, was actually $5,681.77). In addition to the AT & T card, Reynolds also scheduled First Card for $7,475.00; and First Union credit card, for

$1,700.00. The Associates was also listed with two accounts, one with a $500.00 balance; the other, with a $350.00 balance for Reynolds' use of "checks" sent to him in other mail credit solicitations. No other unsecured creditors are listed in the debtor's Schedule F.

Reynolds listed two secured creditors: BankAmerica on his mobile home; and Sears on a television. The debtor has filed agreements reaffirming both secured debts with the court. (BK Docs. 4 and 8)

The debtor testified that he had planned to pay his credit card bill with the extra money he received from his roommate, but that his roommate moved before he could make payment on this account. He also stated that his girlfriend was to help by repaying the charges that she made, but that she left him, paying nothing for the account.

AT & T filed this Section 523(a)(2)(A) dischargeability action (Adversary Proceeding 97–70036–CMS–7) against Reynolds January 27, 1997. The complaint alleged that AT & T "reasonably relied" on the information Reynolds stated on his application before issuing him the card. The creditor also alleged Reynolds made fraudulent representations that he intended to pay the account each time he made one of the February 1996 charges.

Following the November 24, 1997 hearing, the court took the case under submission with filing of the last brief December 1, 1997.

## FINDINGS OF FACT: Dawson

Andrea Ware, AT & T employee; and the debtor, Ira L. Dawson testified at the hearing on this case, which was also held on November 24, 1997. Various written documentation on Dawson's AT & T account was placed in evidence. The facts are not in dispute. The issue is the application of the law to the facts.

Dawson testified he had had the AT & T credit card for approximately 15 years. In December of 1995, the debtor's credit card statement reflected a $15.40 credit. The debtor was then a graduate assistant at the University of Alabama making approximately $800.00 per month. Dawson began a new job around February of 1996 and his income increased to the $1,823.70 gross, $1,218.00 net, level of the time of the trial.

AT & T's Exhibits 1 through nine show the history of the debtor's account beginning with the statement closing date of January 18, 1996 and running through September of 1996. These accounts are summarized in the attached Exhibit A. A review of Exhibit A shows the debtor's balance escalated each month, but that Dawson also made the minimum payment required by AT & T each month until July of 1996.

By the end of July, the debtor's AT & T credit card debt exceeded his limit of $6,700.00. After he exceeded the credit limit, Dawson made only one $158.00–partial–payment following the August 18, 1996 billing statement. This was less than the $525.98 minimum payment required by Dawson's contract with AT & T to bring the account current.

Most of the debt charged to the card came from cash advances. Actual purchases were nominal—they totaled only an approximate $385.00. However, cash advances, including finance charges, totaled $7,235.00. Approximately $4,935.00 of these cash advances were made from automatic teller machines at the same gambling casino at Philadelphia, Mississippi. Two $1,000.00 cash advances were made from banks: one, on June 7, 1996; and another, on June 8, 1996.

Some of the bills showed more than one cash advance from a casino ATM on the same day or within two days. Dawson's billings listed two separate cash advances of $302.00 each on December 22, 1995, a Friday. In April, 1996, he received three separate cash advances of $202.00 each from a casino ATM, one on April 20, 1996, a Saturday, and two on April 22, 1996, a Monday. In early May, 1996, Dawson received cash advances from a casino ATM on May 11, a Saturday, $300.85; May 12, a Sunday, $302.00; and May 16, the following Thursday, $302.00. Then he received a cash advance of $302.00 on May 24, 1996, a Friday, and a cash advance of $302.00 on May 25, 1996, a Saturday; and a $524.99 cash advance on May 26, 1996, a Sunday, from a casino ATM. In

June, he received three cash advances of $317.99 each, all on June 22, 1996, a Saturday, from the casino ATM.

Between December of 1995 and July of 1996, Dawson's minimum payment to AT & T went from $24.44 to $525.98 for the August statement. Prior to July, the debtor had made payments slightly in excess of the minimum payment; and one (May statement) payment of $500.00 for a minimum payment of only $76.46.

Including finance charges, Dawson's AT & T account balance was $7,192.20 when he filed bankruptcy December 3, 1996. A review of Dawson's Schedule F (unsecured creditors), filed with his bankruptcy petition, shows three additional credit card balances totaling $9,800.00. The debtor also scheduled additional unsecured creditor, Lincoln Center, for a $13,732.00, which, based on the creditor's claim, appears to be for a student loan. Dawson has also entered a reaffirmation agreement with his only secured creditor, AmSouth Bank, in connection with his 1995 Oldsmobile automobile.

Dawson testified that he had used his AT & T credit card, as well as other credit cards, at the casino before December of 1995 as well, but that he had been able to pay his accounts. The debtor said his financial difficulties began when he became obligated for child support payments. Although Dawson testified his child support payments were $605.00 per month, his Schedule I shows that while his total payroll deduction was $605.00 per month, only $140.00 per month was for child support.

Dawson said he was able to make his minimum credit card payments during this period. However, he said when his exwife began new child support proceedings against him, his divorce lawyer referred him to a bankruptcy attorney to discuss his debts. He met with his bankruptcy lawyer in September of 1996 and then filed Chapter 7 bankruptcy December 3, 1996.

AT & T filed this Section 523(a)(2)(A) dischargeability lawsuit against the debtor March 10, 1997. Following the November 24, 1997 hearing, the court took the case under submission when the last brief was filed December 1, 1997.

## CONCLUSIONS OF LAW

The court has jurisdiction of the Reynolds and Dawson bankruptcy cases pursuant to 28 U.S.C. § 1334(a). 28 U.S.C. §§ 1334(b) provides bankruptcy jurisdiction of these two dischargeability lawsuits, core proceedings arising under 11 U.S.C. §§ 523(a)(2)(A), as defined in 28 U.S.C. § 157(b)(2)(I). Jurisdiction to enter a final order is granted this court by the Standing Order of Reference entered by the United States District Court for the Northern District of Alabama.

In both cases, AT & T has asked this Bankruptcy Court to determine that its claims against the debtors are nondischargeable under 11 U.S.C. § 523(a)(2)(A) which prohibits bankruptcy discharge of debts obtained by false pretense, a false representation or actual fraud. The facts are undisputed in both cases. The application of the law to the facts in each case is in dispute.

## I.

*Plaintiffs must establish all five elements of common law fraud to prevail in a Section 523(a)(2)(A) dischargeability lawsuit.*

**A. Defining the elements of a Section 523(a)(2)(A) cause of action.**

■ For a creditor to prevail in a Section 523(a)(2)(A) [2] nondischargeability lawsuit, all five elements of traditional common law fraud must be established by a preponderance of the evidence. *See Field v. Mans*, 516 U.S. 59, 68–70, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995); *Grogan v. Garner*, 498

---

2. **11 U.S.C. § 523(a)(2)(A)** provides the following:

**Exceptions to discharge.**

(a) *A discharge under section 727*, 1141, 1228(a), 1228(b), or 1328(b) of this title *does not discharge an individual debtor from any debt*—

(2) for money, property, services, or *an extension*, renewal, or refinancing *of credit*, to the extent obtained by—

(A) *false pretenses, a false representation, or actual fraud*, other than a statement respecting the debtor's or an insider's financial condition; ... (emphasis added)

U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Fuller v. Johannessen (In re Johannessen)* 76 F.3d 347, 350 (11th Cir.1996); *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577 (11th Cir.1986); *American Express Travel Related Services Company, Inc. v. McKinnon (In re McKinnon)*, 192 B.R. 768 (Bankr.N.D.Ala.1996); and *AT & T Universal Card Services Corporation v. Reach (In re Reach)*, No. 96–02488–TOM–7 slip op. (Bankr.N.D.Ala. July 16, 1997).

As synthesized in *Field*, 516 U.S. at 74–76, 116 S.Ct. at 446; *McKinnon*, 192 B.R. at 771 and other cases, these elements of common law fraud/nondischargeability under Section 523(a)(2) are the following:

(1) The debtor made representations;

(2) knowing the representations were false at the time they were made;

(3) with the intent to deceive the creditor;

(4) the creditor justifiably relied on the representations; *and*

(5) the creditor's loss was the proximate result of the misrepresentation having been made.

Failure to prove any one of the five elements is fatal to the creditor's nondischargeability case. *See McKinnon*, 192 B.R. at 771. The United States Supreme Court in *Field* recognized that Section 523(a)(2)(A) incorporates the elements of the common law torts of false pretense, false representation and

actual fraud. The Supreme Court held that the "reliance" element should be "justifiable reliance," not the "reasonable reliance" standard applied by the First Circuit Court of Appeals in that case. Although *Field* was not a credit card case, the court's definition of the elements for Section 523(a)(2)(A) applies generally to all lawsuits under that section.

The statute itself, Section 523(a)(2)(A), does not state the elements of fraud explicitly, including the "reliance" element and the required level of "reliance." The Supreme Court held in *Field* that the "justifiable reliance" standard, used by 36 states (including Alabama[3]) when the Bankruptcy Code of 1978 was enacted by Congress, was correct. Only five states used the "reasonable reliance" standard in 1978 while five others used "actual reliance," the decision said.

The court described "justifiable reliance" as an intermediate level of reliance between the lower, objective "actual reliance" and the higher subjective "reasonable reliance". But even though it described "justifiable reliance" as a less demanding standard of proof than "reasonable reliance," the opinion emphasized that " '. . . Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than the application of a community standard of conduct to all

---

**3.** The Supreme Court of the United States cited the Alabama Supreme Court's 1941 *Franklin v. Nunnelley*, 242 Ala. 87, 89, 5 So.2d 99, 101 (1941) for Alabama's use of the intermediate or "justifiable reliance" standard. *See*, 516 U.S. at 75 n. 12, 116 S.Ct. at 446 n. 12, 133 L.Ed.2d 351. *Nunnelley* states of reliance:

Upon the question of fraudulent representation the rule is that when the statement of fact is assumed to be within the knowledge of the person making it (and the amended bill here so discloses), the other has the right to rely on its truth, and in the absence of anything to arouse suspicion is not bound to make inquiry or examine for himself. *Parker v. Ward*, 224 Ala. 80, 139 So. 215 (1932).

However, the Alabama Supreme Court's view of its own precedent as stated in *Foremost Insurance Company v. Parham*, 693 So.2d 409 (Ala. 1997) differs. In the *Parham* case, the Alabama court replaced the "justifiable reliance" standard with the "reasonable reliance" standard for lawsuits filed after March 14, 1997. The Alabama

court stated the former "justifiable reliance" standard as it said was enacted by *Hickox v. Stover*, 551 So.2d 259 (Ala.1989) had eliminated "the 140–year–old standard for determining the reliance issue in fraud cases" (apparently in the court's view, "reasonable reliance"). *See Parham*, 693 So.2d at 420. The Alabama court attributed the application of the "reasonable reliance" standard in consumer transactions to *Torres v. State Farm Fire and Casualty Co.*, 438 So.2d 757 (Ala.1983), which it stated was overruled by the *Hickox* case. The *Nunnelley* case is cited only once in this massive decision—Justice Almon cited it as an example of the "reasonable reliance" standard in his special concurrence. *Parham*, 693 So.2d at 436. The Alabama Supreme Court stated application of the "justifiable reliance" standard eliminated a consumer's "duty to attempt to read and to attempt to understand the contents of a document", *see Parham*, 693 So.2d at 418. The court said ". . . we overrule *Hickox*, to the extent that it changed the law of fraud as it had existed prior thereto." *Parham*, 693 So.2d at 421.

cases.'" *Field,* 516 U.S. at 71, 116 S.Ct. at 444, citing the Restatement (Second) of Torts (1976).

The Supreme Court further quoted the Restatement distillation of common law "justifiable reliance" to mean:

... [A] person is

"[R]equired to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation...."

*Field,* 516 U.S. at 71, 116 S.Ct. at 444.

Shortly before the Supreme Court's November 28, 1995 *Field* decision, the Eleventh Circuit Court of Appeals had also adopted "justifiable reliance" as "an element of actual fraud, or false pretenses that must be proven to prevent discharge of the debt" pursuant to Section 523(a)(2)(A). The Eleventh Circuit's *City Bank & Trust Co. v. Vann (In re Vann),* 67 F.3d 277, 284 (11th Cir.1995) was entered on October 19, 1995, a little more than a month before *Field.*[4] *Bropson v. Thomas (In re Bropson),* 217 B.R. 650, 653–54 (M.D.Fla.1998) looked at the attributes of the individual creditor/plaintiff and debtor/defendant to determine that creditor's reliance was not justifiable:

Even if the plaintiff (creditor) could prove a false representation was made with the intent to deceive, the plaintiff's reliance on the representation was not justifiable. This is not a situation in which a sophisticated businessman enticed an uneducated novice into a bad deal. On the contrary, the plaintiff in this proceeding has a degree in accounting and has experience in business, including the car lot business. Unfortunately, the plaintiff made a bad investment and used poor judgment in con-

tinuing to make loans to the manager (debtor) when the original loans were not being repaid pursuant to the terms of their agreement. There is no doubt that the manager possessed extremely inadequate business skills and used the proceeds obtained in the sale of the lot's vehicles to pay his own business expenses rather than to repay the plaintiff's loans. However, these grounds do not amount to fraud and are not sufficient for an exception to discharge under § 523(a)(2)(A).

In *Birmingham Trust National Bank v. Case,* 755 F.2d 1474 (1985), the Eleventh Circuit called prior case law like the *First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983) "a useful guide" in applying Section 523(a)(2)(A) of the then-new 1978 Bankruptcy Act. In *Case,* the court applied the old law to hold that "... [R]eckless indifference to the truth is sufficient to bar a discharge ..." stating further:

Since the Debtor advances no sound reason for distinguishing the rule established in these cases (all under pre–1978 law) from the instant case, we hold that reckless disregard for the truth or falsity of a statement constitutes a "false representation" under § 523(a)(2)(A) of the Bankruptcy Code.

*Case,* 755 F.2d at 1476.

This case is frequently cited as a means of allowing reckless behavior to substitute for the "knowingly false, with intent to deceive" elements of the common law tort. However, it should be emphasized that the debtor's behavior in this case was so egregious that later courts might have deduced an actual, rather than constructive, "knowingly false, with intent to deceive" representation from the same facts. Case, the debtor, affirma-

4. This court does not view the 11th Circuit's more recent holdings in Section 523(a)(2)(A) cases as conflicting with the policies set out in the court's venerable *First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983). That case was decided under the "false pretenses or false representations" exception to discharge under Section 17(a)(2) of the Bankruptcy Act of 1898. In fact, the *Roddenberry* court noted that a decision under the new Bankruptcy Act of 1978 might be different because of the addition of the phrase "actual fraud" in Section 523(a)(2)(A).

The court explicitly said it would express no opinion on new Section 523(a)(2)(A) in *Roddenberry,* 701 F.2d at 929 at n. 3. Subsequent case law—*Schweig v. Hunter (In re Hunter),* 780 F.2d 1577 (11th Cir.1986); *City Bank & Trust Co. v. Vann (In re Vann),* 67 F.3d 277 (11th Cir.1995) and *Fuller v. Johannessen (In re Johannessen),* 76 F.3d 347 (11th Cir.1996)—does not specifically overrule the previous case under prior law. It represents the court's progression in construction of Section 523(a)(2)(A), new law; in the factual context of new cases.

tively asked Birmingham Trust to make a loan based on collateral he represented that he owned. After default, the debtor revealed the property was in possession of another entity, an entity which the bank later discovered owned the purported collateral.

*See also Palmacci v. Umpierrez,* 121 F.3d 781, 787–88 (1st Cir.1997) which allowed reckless behavior to meet the intent elements of fraud for Section 523(a)(2)(A) on the judgment of the bankruptcy court:

> It is the province of the trial court to determine this issue: the court may choose to infer intent or not to draw that inference, based on all the evidence.... The determination of whether scienter exists based on certain circumstantial facts must be treated merely as "a permissible inference of fact ... and not a presumption of law, or else the distinction between fraud and negligence will be largely obliterated."

*Palmacci,* 121 F.3d at 790.

The Ninth Circuit Court of Appeals has also allowed "reckless disregard for the truth" to constitute the level of intent needed for fraud under Section 523(a)(2)(A). *See Anastas v. American Savings Bank (In re Anastas),* 94 F.3d 1280, 1286 (9th Cir.1996). However, the appeals court emphasized that to comprise the intent needed for common law fraud, the debtor's behavior must be blameworthy:

> We emphasize that the representation made by the card holder in a credit card transaction is not that he has an *ability* to repay the debt; it is that he has an *intention* to repay. Indeed, section 523(a)(2) expressly prohibits using a non-written representation of a debtor's financial condition as a basis for fraud.
>
> Thus, the focus should not be on whether the debtor was hopelessly insolvent at the time he made the credit card charges. A person on the verge of bankruptcy may have been brought to that point by a series of unwise financial choices, such as spending beyond his means, and if ability to repay were the focus of the fraud inquiry, too often would there be an unfounded judgment of non-dischargeability of credit card debt. Rather, the express focus must be solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt.

*Anastas,* 94 F.3d at 1285–86.[5]

The late Judge Clarence Allgood also applied the elements of common law fraud to proof of nondischargeability under Section 523(a)(2)(A) in *Schweig v. Hunter (In re Hunter),* 780 F.2d 1577 (11th Cir.1986). The only divergence from the later *Field* case was in the evidence standard required for proof of fraud elements. *Hunter* was a pre-*Grogan v. Garner* decision, and required a "clear and convincing" standard for proof of common law fraud. *Grogan v. Garner* did not decree a uniform "preponderance of evidence" standard for all the Section 523 exceptions, including those sounding in fraud, until 1991.

Bankruptcy Judge Jack Caddell in *American Express Travel Related Services Company, Inc. v. McKinnon (In re McKinnon),* 192 B.R. 768 (Bankr.N.D.Ala.1996) provides an excellent analysis of the various tests used to determine whether or not a modern credit card debt comes within the Section 523(a)(2)(A) exception. Judge Caddell concluded that the common law tests prescribed in the then-recent *Field* decision are the correct means to analyze a Section 523(a)(2)(A) objection to discharge.

The *McKinnon* case was a credit card case in which the debtor had owed American Express Travel a total $40,142.50. At the time the charges were made, the debtor, a school-teacher, had a monthly income of $2,374.00 while her monthly expenses totaled $2,494.00—a monthly deficit of $120.00. The debtor testified the American Express charges were for expenses associated with publication of a textbook. She testified that she intended to repay American Express with her share of the proceeds from the text.

When the book ran over budget, her business associates abandoned the project and left the teacher/investor with the credit card

---

5. *Muleshoe State Bank v. Black,* 77 B.R. 91 (N.D.Tex.1987) declined to allow "reckless" intent to fulfill intent elements required for common law fraud under Section 523(a)(2)(A).

debt. American Express had not established a credit line for either of the two accounts and both account contracts required full repayment of charges at the end of each billing cycle.

The court found that American Express failed to prove that:

> McKinnon knowingly made a false representation with the intent to deceive.... Although it is uncontroverted that McKinnon lacked the ability to repay the charges when made, the Court believes she fully intended to repay the obligations and believed she had an ability to do so in reliance upon her contract with GPA and LKC.

*McKinnon,* 192 B.R. at 776.

The court held that Ms. McKinnon's debt to American Express was dischargeable because the creditor had failed to prove the second and third elements of common law fraud by a preponderance of the evidence. In *McKinnon,* the Alabama bankruptcy court relied on the general enunciation of the common law test as set out in *Chase Manhattan Bank v. Murphy (In re Murphy),* 190 B.R. 327, 332–34 (Bankr.N.D.Ill.1995)

Murphy, the debtor, was a gambler and an investor in risky stock transactions in addition to working as a real estate manager. The court found that he had used his American Express card for cash advances for gambling for as long as 20 years before a "losing streak" brought him to the bankruptcy court in 1994. Before, he had always been able to repay the cash advances. The court found that "The evidence established that the Debtor could not have paid the credit card debt solely from the income earned at his day job in the real estate business." 190 B.R. at 330.

■ This Bankruptcy Court agrees with Judge Caddell and the Supreme Court of the United States that common law principles must determine dischargeability of a debt under Section 523(a)(2)(A). The court will also follow *McKinnon* and the *Murphy* case in construing a consumer's use of a credit card as a promise to pay in future, not an implied representation of the present intent to repay and of the debtor's actual ability to repay. As stated in *Murphy:*

The Court does not agree with the implied representation cases that hold that the use of a credit card is also an implied representation of an ability to pay. One of the principal reasons people rely on credit is a present lack of ability to pay.... But the use of a credit card is a representation regarding future action. Under the common law a promise to perform a statement of future intention is actionable as fraud only if, at the time the statement was made, the debtor never intended to honor his statement.... "A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." (citing Restatement (Second) of Torts (1976) § 530(1))

*Murphy,* 190 B.R. at 332. *See also American Express Travel Related Services, Inc. v. Hearn (In re Hearn),* 211 B.R. 774 (Bankr. N.D.Ga.1997).

■ Further, this court construes the "promise to pay" made by a debtor using a credit card as a promise to pay under terms of the debtor's contract with the credit card issuer. If a "minimum payment" is prescribed by the issuer and the account is not treated as delinquent until the debtor defaults on such a payment, a debtor's use of the card cannot be a "false" representation until default.

The court will review the facts of both the Reynolds and Dawson lawsuits in the context of that common law test.

**B. Three elements of fraud appear to be in issue in these two Chapter 7 cases.**

In both the Reynolds and Dawson cases, it is the second, third and fourth elements of common law fraud which are in issue.

In many modern credit card transactions, the debtor has no face-to-face transactions, makes no face-to-face "representations" to the credit card issuer when charges are made. The debtor's only contact with the creditor is when the initial contract is drawn up (by the creditor) under which the debtor agrees to make certain payments on certain terms to the creditor. Representations of some sort are required as the first element of common law fraud under Section 523(a)(2)(A).

It is undisputed that both debtors made representations to AT & T. Neither disputes the charges (representations) attributed to their cards. In Reynolds' case, the debtor's initial application/answer to the mail solicitation was also entered in evidence. However, AT & T has not alleged any of the information on the application was false.

It is also undisputed that neither debtor paid AT & T for the credit extended with the card's usage. So the debtors' use of their cards (representation) was the proximate cause for the creditor's monetary loss equal to the unpaid account balances, the fifth element of common law fraud.

What is in issue is the second and third elements of common law fraud: whether the debtors knew they would not repay AT & T at the time they used the card and whether the charges were thus made with the affirmative intent to deceive AT & T. Additionally, AT & T must prove its reliance on the debtors' representations was "justifiable," the fourth element of common law fraud. Under the *Field* guideline, AT & T must prove there was nothing "patent" on the face of the representations to put AT & T on notice that a cursory investigation might reveal Reynolds and Dawson as poor credit risks.

As stated of the intent element in *Keybank v. McCreery (In re McCreery)*, 213 B.R. 689, 694 (Bankr.N.D.Ohio 1997):

> Although the fact that the debtor could not objectively have expected to be able to pay the charges may help support an inference of fraud, that fact alone is inconclusive. In addition, the plaintiff must prove that the debtor affirmatively acted with fraudulent intent.
>
> The fraudulent intent required to be proven is the debtor's actual intent which cannot be inferred solely from a debtor's insolvency, unemployment, or financial condition, but must be ascertained from all the relevant facts and circumstances.

*McCreery*, 213 B.R. at 694.

As stated by *Field*, there is no "community standard" for determining whether a plaintiff's reliance is "justifiable". Rather "... Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, ..." *Field*, 516 U.S. at 71, 116 S.Ct. at 444. As noted by the Eleventh Circuit Court of Appeals in the *Vann* case, "... Justifiable reliance requires the creditor to act appropriately according to his individual circumstances." *Vann*, 67 F.3d at 284.

In *McCreery*, Judge Shea–Stonum found that there was *no evidence* that Keybank's reliance on McCreery's representation was "justifiable," much less *a preponderance of evidence* showing justification:

> The Sixth Circuit held that a lender shows reliance by having, at a minimum, evaluated the creditworthiness of the debtor and ordinary credit information about the debtor prior to extending credit. *In re Ward*, 857 F.2d at 1085–86. In the absence of at least this minimum evidence of reliance, plaintiff cannot prove his claim under 11 U.S.C. § 523(a)(2)(A).

*McCreery*, 213 B.R. at 695.

*See Sears, Roebuck and Co., et al. v. Taylor (In re Taylor)*, 211 B.R. 1006, 1013 (Bankr.M.D.Fla.1997) for an example of a debtor's false misrepresentation which was blameworthy enough; the creditor's (GE Capital Corporation/Macy's) reliance justifiable enough, for the court to except the debt from discharge under Section 523(a)(2)(A).

This court will examine the facts in the Reynolds and Dawson cases individually to determine if the two debtors knowingly made false representations with the intent to deceive AT & T; and whether AT & T's reliance on the representations was "justifiable."

## II.

### *REYNOLDS: AT & T failed to establish all five elements of common law fraud pursuant to 11 U.S.C. § 523(a)(2)*

**A. Reynolds' use and authorization of use of his AT & T card in February, 1996, was in reckless disregard of whether he would be able to repay in the meaning of *Birmingham Trust National Bank v. Case*, 755 F.2d 1474 (11th Cir.1985).**

To have Reynolds' debt declared nondischargeable under Section 523(a)(2)(A), AT

& T must prove that when the charges were made, Reynolds made a false representation that he would pay pursuant to the credit card agreement (i.e. pay at least the minimum monthly amount required) for his first month's usage. In this case, the debtor exceeded his $5,000.00 credit limit within a 14-day period with a resulting minimum payment of $327.04 due.

Reynolds testified that he intended to pay, and that he expected to be able to pay from rent received from roommates and from reimbursement from his girlfriend for her use of the card. However, his reliance upon such speculative financial arrangements appears to be a reckless disregard of the truth of his ability to make the minimum monthly payments within the meaning of *Birmingham Trust National Bank v. Case*, 755 F.2d 1474 (11th Cir.1985).

The more than $5,000.00 in cash advances and purchases within 14 days is evidence that Reynolds was "loading up" his credit card, making any possibility of repayment unrealistic. Such would appear to constitute reckless disregard of the actual facts of his financial situation. So the court construes Reynolds' reckless use and authorization of use of the card as satisfying the second and third element of common law fraud—that the representation was false and that the debtor made the representation with intent to deceive the creditor in the meaning of "false representation" in Section 523(a)(2)(A).

**B. However, AT & T's reliance on his representations was not the "justifiable reliance" required for proof of common law fraud for Section 523(a)(2)(A) nondischargeability.**

■ AT & T mailed Reynolds a mail solicitation. AT & T representatives provided no evidence about where the creditor secured the address. When the debtor responded to the solicitation by applying for the offered card, he truthfully provided the information requested: including the fact that he had an annual income of only $10,000.00. He also provided his name, Social Security number, date of birth and telephone number. This was all AT & T requested.

AT & T is a corporate creditor that does credit card business with consumers through-

out the United States on a mass basis. Yet, AT & T provided no evidence of any effort to verify the information on Reynolds' credit card application, to inquire further on the source of his $10,000.00 income or to ascertain that he was creditworthy. Without investigating further, AT & T issued a card with a credit line of $5,000.00, despite the fact that his application has placed it on notice that the line of credit amounted to one-half of his annual income.

The Sixth Circuit held in *Manufacturer's Hanover Trust Company v. Ward (In re Ward)*, 857 F.2d 1082, 1085–86 (6th Cir.1988) that a lender must show justifiable reliance by having, at a minimum, evaluated the creditworthiness of the debtor in ordinary credit information before the extension of credit. A minimum evaluation of the Reynolds's creditworthiness would have shown that in fact, his $10,000.00 annual income was Social Security benefits for the chemical brain disorder that disables him. Under the *Ward* rationale, AT & T's failure to make any inquiry as to the debtor's creditworthiness would preclude a finding of justifiable reliance on Reynolds' representations.

AT & T was also the plaintiff in *AT&T Universal CardServices Corp. v. Santos*, 213 B.R. 387 (M.D.Fla.1997). In that case, debtor Connie L. Santos had stated her projected income for 1994 at $56,000.00 on her AT & T application—her best estimate on the proceeds from a senior care service she was starting up. Her application was in response to "an unsolicited, pre-approved credit card application" from AT & T. *Santos*, 213 B.R. at 388. Interestingly, AT & T found that $56,000.00 in annual income justified a credit line of only $2,500.00 on the card it issued Santos (as compared with the $5,000.00 credit line it approved for Reynolds based on a stated $10,000.00 income).

As with Reynolds, Santos used the credit for only one month and defaulted on the first payment after she used up her $2,500.00 line of credit. The purchases were made in September of 1994 and default came after that month. Ms. Santos filed Chapter 7 in October of 1995.

The Florida District Court affirmed the Bankruptcy Court's decision that Santos' debt to AT & T was not excepted from discharge under Section 523(a)(2)(A). The court found that Santos' estimate of her projected income was credible and that she used the credit card fully intending to repay the debt. *Santos,* 213 B.R. at 390.

In the Reynolds case in this court, testimony also showed that AT & T was aware of unusual account activity in Reynolds' account by February 13, 1996, but took no action. Approximately $800.00 in additional charges were made after that date.

**C. Therefore, AT & T's claim in this lawsuit must be DENIED, since the plaintiff failed to prove the justifiable reliance required for fraud nondischargeability under Section 523(a)(2)(A).**

While the court finds that charges were made on Reynolds' AT & T card in reckless disregard of his ability to make the minimum payment and that AT & T suffered a loss caused by the failure to pay the account, AT & T's request to have the debt declared nondischargeable in bankruptcy under Section 523(a)(2)(A) must be **DENIED.** The creditor failed to prove by a preponderance of the evidence that its reliance on Reynolds' representations was justified, and thus failed to established all five elements of proof of common law fraud to have the debt declared nondischargeable under the Supreme Court's *Field* decision.

### III.

**DAWSON: *AT & T failed to prove all five elements of common law fraud pursuant to Section 523(a)(2)(A).***

**A. Dawson's use of his AT & T card in June constituted a reckless disregard of the truth about his ability to repay the cash advances in July.**

 AT & T offered no evidence to controvert the debtor's testimony that he had the AT & T credit card for fifteen years. It offered no evidence rebutting the debtor's testimony that during those years he used his card to gamble and still paid his monthly minimum payments until his 1996 "losing streak." That streak apparently began in late December of 1995 and escalated through June of 1996 after which he defaulted on the minimum payment due in July of 1996.

There was no evidence that Dawson attempted to use the AT & T card again after he exceeded his credit limit and failed to make the monthly minimum payment for the first time. In fact, the debtor made one partial payment ($158.00, compared to a required minimum payment of $525.98 on his August statement) after he ceased using the card.

The July charges were the first which were in breach of his agreement with AT & T, according to the evidence offered in this case, since previously he had fulfilled his "promise to pay" the minimum payment. Only the July charges can be construed as a "false representation" under Section 523(a)(2)(A) and as satisfying the "knowingly false representation with intent to deceive" elements two and three of common law fraud. That may be done only by applying the "reckless disregard of the truth" standard allowed in the 1983 *Case* decision.

**B. AT & T failed to prove by a preponderance of the evidence that its reliance on Dawson's representation that he would pay the minimum payment after the July billing was "justifiable."**

There was no evidence AT & T communicated with Dawson although he used the card almost exclusively for cash advances, sometimes more than one in a day, at ATMs located within the same gambling casino at Philadelphia, Mississippi. There was no evidence AT & T attempted to communicate with Dawson about this activity as long as he made the required minimum payments. Credit card issuers which allow cash advances on ATMs in gambling casinos are on notice their customers may use the money to gamble, and presumably that some gamblers may be poor credit risks.

AT & T was also plaintiff in *AT & T Universal Card Services v. Crutcher (In re Crutcher),* 215 B.R. 696 (Bankr.W.D.Tenn. 1997) and *AT & T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr. N.D.Ill.1996).

Norma Jane Crutcher user her AT & T Universal MasterCard to obtain more than $11,000.00 in cash advances at various gambling casinos at Tunica, Mississippi over a 10–day period in April of 1995. *Crutcher*, 215 B.R. at 697. This debt was the one AT & T sought to have declared nondischargeable under Section 523(a)(2)(A) after Ms. Crutcher filed her Chapter 7 petition in March 19, 1996. However, it was not the first time the debtor's "severe gambling addiction" had brought her into near default on the card:

> In February 1995, Crutcher's outstanding balance on her AT & T Mastercard was $11,600.00. On February 23, 1995, Crutcher called AT & T to inform them she was considering filing a chapter 13 bankruptcy petition. Despite this professed intention, Crutcher was able to pay off the entire balance of her card by refinancing her house once again. On April 7, 1995, Crutcher sent AT & T a check for $11,600.00 which had the effect of reducing the balance on her MasterCard to $0.00.

> Upon paying her MasterCard bill in full, Crutcher informed AT & T that she was an addicted gambler and requested that AT & T close her account and not reopen it under any circumstances. On April 11, 1995, however, Crutcher found herself in the unfortunate situation of owing a casino $2500.00. Faced with the prospect of going to jail unless the money was repaid, Crutcher phoned AT & T and sought an emergency cash withdrawal of $2500.00. AT & T approved this transaction and charged the $2500.00 to the debtor's MasterCard account.

> With her AT & T account now reactivated, Crutcher used the cash advance privileges of her MasterCard to go on a gambling spree in late April of 1995.

*Crutcher*, 215 B.R. at 698.

The court nevertheless found that the final $11,885.75 debt she amassed, between the $2500.00 payment to the casino and a subsequent 24–hour gambling binge, was not

barred from discharge under Section 523(a)(2)(A).[6]

The 1996 *Alvi* case in Illinois involved an unemployed debtor who "maxed out" his AT & T card between August 22, 1994 and October 24, 1994, by getting $7,956.90 in cash advances at a gambling casino in Aurora, Ill. FCC National Bank was also a plaintiff in this Section 523(a)(2)(A) nondischargeability suit. The debtor had used up his credit limit on FCC's card in the last few days of October 1994 by getting cash advances at the same gambling casino.

Debtor Tanvir Alvi had been laid off from his job as a hospital security officer when he received the cash advances at the casino. However, he was still on payroll and believed he would be recalled to duty at the end of a layoff period. In fact, he had paid off the $1,088.18 balance on the AT & T card in full before his two-month losing streak. Afterward, he only made one $130.00 payment on September 26, 1994. He was not recalled to work as he had expected.

AT & T "reminded the Debtor on his November 13, 1994 statement that his 'minimum payment includes over limit and past due amounts' and requested immediate payment. While the Debtor did not remit an immediate payment as AT & T demanded, he made no further charges on his AT & T card." *Alvi*, 191 B.R. at 727. FCC asked him not to make further charges on that card until he had made the minimum payment needed to bring the account current. FCC's October 1994 statement warned: " 'as of this date, the balance on your account is $291.94 over your credit limit. Please refrain from further use of your account until $384.94 has been paid.' " *Alvi*, 191 B.R. at 727.

The *Alvi* court cited to a policy statement in the Eleventh Circuit Court of Appeals' old *Roddenberry* case as it held that Alvi's debts to AT & T and FCC were not excepted from discharge under Section 523(a)(2)(A). The court found the creditors' reliance on the debtor's use of the cards (his representations that he intended to pay) was not "justifiable":

---

**6.** Dawson did not allege that his debt problems were due to any "gambling addiction" in the case before this Bankruptcy Court.

AT & T and FCC did not prove by a preponderance of the evidence that they each actually and justifiably relied on any representations of the Debtor in making the cash advances at issue in this proceeding. In fact, the Plaintiffs offered virtually no evidence about their reliance on any misrepresentations by the Debtor. The Court cannot just assume the Plaintiffs in these proceedings actually relied on any alleged representation by the Debtor in doing business with him. Case law indicates that some credit card issuers choose not to prevent the use and abuse of their cards; instead, they have calculated the attendant risks and allow consumers relatively free reign (sic) with their cards and credit limits. "Banks are willing to risk non-payment of debts because that risk is factored into finance charges. Because the risk is voluntary and calculated, [523(a)(2)(A)] should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their credit limits." *First Nat'l Bank of Mobile v. Roddenberry*, 701 F.2d 927, 932 (11th Cir.1983). Creditors "might just as well pass out cards to every working person it can find and hope those who use them will pay for the charges." *In re Pressgrove*, 147 B.R. 244 (Bankr.D.Kan. 1992) (finding debt to credit card issuers dischargeable).

*Alvi*, 191 B.R. at 731.

This particular plaintiff, AT & T, is a national corporation doing a mass credit card business with consumers across the United States. Its electronic billing/account reporting system allows it to monitor a customer's credit practices during and after the billing cycle. It has clearly had notice of the risk that multiple cash advances from the floors of gambling casinos portend. In this case, Dawson had an income of only $800.00 per month as a graduate instructor before his "losing streak" began. After it began, he had a slightly higher net pay but it was still only $1,218.00 per month.

The activity in Dawson's account and a cursory review of his circumstances would have put an alert creditor on notice that further investigation of his creditworthiness and overall financial situation was needed.

**C. Therefore, AT & T's claim in the Dawson lawsuit must also be DENIED, since the plaintiff failed to prove the justifiable reliance required for fraud nondischargeability under Section 523(a)(2)(A).**

Therefore, AT & T failed to prove that its reliance on Dawson's representation that he would repay the escalating credit card debt was "justifiable" in the *Field* definition of common law fraud as applied in Section 523(a)(2)(A) nondischargeability lawsuits.

### CONCLUSION

Creditor AT & T Universal Card Services Corp.'s request to have the indebtedness of debtor Donald Reynolds (AP 97–70036–CMS–7) and of debtor Ira L. Dawson (AP 97–70102–CMS–7) declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) must be **DENIED.** Reynolds' and Dawson's debts to AT & T are **DISCHARGEABLE** and to be included in any discharge granted the debtors by this court. An order consistent with this memorandum, findings pursuant to Fed. R. Bankr.P. 7052, will be entered separately.

### EXHIBIT A

| Exhibit Number | Statement Closing Date | Purchases | Cash Advances | Balance Due | Minimum Payment | Amount Paid |
|---|---|---|---|---|---|---|
| 1 | 01/18/96 | 75.40 | 921.99 (all casino) | 1010.91 | 24.44 | 25.00 |
| 2 | 02/18/96 | 140.76 | 719.99 (all casino) | 1888.11 | 48.63 | 50.00 |
| 8 | 03/18/96 | 0 | 0 | 1860.89 | 41.98 | 60.90 |

| 3 | 04/18/96 | 136.15 | 0 | 1955.80 | 41.00 | 45.00 |
|---|---|---|---|---|---|---|
| 4 | 05/18/96 | 25.50 | 1510.85 (all but $300 casino) | 3507.28 | 76.46 | 500.00 |
| 5 | 06/18/96 | 7.20 | 3128.99 (1129.00 from casino) | 6262.26 | 137.87 | 138.00 |
| 6 | 07/18/96 | 0 | 953.97 all casino | 6857.31 | 310.07 | 0 |
| 8 | 08/18/96 | 0 | 0 | 6928.22 | 525.98 | 158.00 |
| 7 | 09/18/96 | 0 | 0 | 6840.32 | 424.08 | 0 |