**In re Barbara Jeanne MEYER, Debtor.**

**Compass Bank, Plaintiff,**

**v.**

**Barbara Jeanne Meyer, Defendant.**

**Bankruptcy No. 02–03684–TOM–7.**
**Adversary No. 02–00167–TOM–7.**

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

Feb. 25, 2003.

---

Paul J. Spina, Birmingham, AL, for Compass Bank.

Charles Cleveland, Birmingham, AL, for Defendant/Debtor.

### MEMORANDUM OPINION AND ORDER

TAMARA O. MITCHELL, Chief Judge.

This matter comes before the Court on a Complaint to Determine Dischargeability of Debt filed by Plaintiff/Creditor Compass Bank on July 1, 2002. Appearing at the trial on January 29, 2003, were Paul J. Spina, counsel for Compass Bank; Charles Cleveland, counsel for the Defendant/Debtor Barbara Jeanne Meyer; Bonnie Campbell, witness for Compass Bank; Douglas Corretti, witness for Barbara Jeanne Meyer; and Barbara Jeanne Meyer. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a)(1994) [1] and the district court's Gen-

---

1. 28 U.S.C. § 1334(b) provides:

Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or

eral Order Of Reference Dated July 16, 1984, As Amended July 17, 1984.[2] This is a core proceeding as set out in 28 U.S.C. § 157(b)(2)(I).[3] This Court must decide whether the debt owed to Compass Bank is nondischargeable pursuant to 11 U.S.C. § 523(a)(2).[4] This Court has considered the pleadings, testimony and documentary evidence offered, and the law, and finds and concludes as follows.[5]

## I. FINDINGS OF FACT[6]

Barbara Jeanne Meyer (hereinafter, "Debtor") filed a petition for relief under

---

courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.
28 U.S.C. § 151 provides:
In each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district. Each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court, except as otherwise provided by law or by rule or by order of the district court.
28 U.S.C. § 157(a) provides:
Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for that district.

2. The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides: The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

3. 28 U.S.C. § 157(b)(2)(I) provides:
(b)(2)core proceedings include, but are not limited to-
(I) determinations as to the dischargeability of particular debts[.]

4. The initial Complaint filed by Compass Bank makes a brief reference to 11 U.S.C. § 727 but did not include a specific prayer for relief under § 727. Compass's prayer for relief references 11 U.S.C. § 523(a)(2), however, it does not specify whether it relies on subsections (A), (B), and/or (C).

Rule 7015(b) of the Federal Rules of Bankruptcy Procedure provides:
(b) Amendments To Conform to the Evidence.
When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.
Fed. R. Bankr.P. 7015. The arguments of counsel and the testimony elicited at trial indicate that the plaintiff is relying on § 523(a)(2)(A) and § 523(a)(2)(C); thus, this Court will proceed as if these sections, and not § 727, had been specifically addressed in the pleadings.

5. This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

6. Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of the contents of its own files. See *ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir.1975).

Chapter 7 of the Bankruptcy Code on May 9, 2002. Compass Bank (hereinafter, "Compass") filed its complaint on July 1, 2002, alleging that Ms. Meyer's debt to Compass of $13,726.48 should be declared to be nondischargeable and that it should be awarded attorney's fees and costs pursuant to its contract. The debt arose as the result of cash advances[7] and charges made on a credit card issued by Compass to Debtor. The Debtor is the only person listed on this account.

The Debtor opened her credit card account with Compass Bank[8] in February 1985. Her credit application reflects that she had an annual salary of $45,000 at that time. (Compass's Exh. 1). Bonnie Campbell, Senior Bankruptcy Specialist at Compass, testified on behalf of Compass at the trial of this matter. According to Ms. Campbell, she believes a credit check was performed on the Debtor at the time she opened the account. Ms. Campbell testified that the Debtor used her credit card from 1985 until the time she filed bankruptcy. She characterized Debtor's use of the card as "normal" and "routine" from December 2000 to February 2002, and with the exception of a convenience check[9] written in May 2001, the Debtor primarily had one charge per month (for AOL service) during this period,[10] but that Debtor's credit card activity changed in March 2002. The Debtor made "frequent use" of her card throughout March and April. According to Ms. Campbell, the Debtor's charges during this time were for trips and motel stays, not "normal living" expenses. Ms. Campbell testified that her file contained no indication that the Debtor was unemployed around this time period, nor any indication that the Debtor tried to work out any arrangements with Compass to get the outstanding credit card balance paid.

Testifying on behalf of the Debtor at trial were the Debtor and Dougals Corretti, a well-known and highly respected attorney practicing in the Birmingham, Alabama area. The Debtor testified that she became unemployed in December 2001 and remained unemployed until May 2002. The only income she received during this period was unemployment income of $823 per month. During this time, however, the Debtor and her husband attempted to generate additional income by associating with Xukor Information Services, Inc., an Atlanta-based company that performs background checks. The Debtor and her husband formed a business called "Resolve Services," through which they were to act

---

7. Debtor's credit card statements reflect that a portion of her outstanding balance is attributable to cash advances. A search of transactions made on or within the 60 day period preceding the bankruptcy filing date reveals that no cash advance transactions were made within this period. (Compass's Exhs. 4 and 5).

8. According to the testimony of Bonnie Campbell, Compass Bank was known as Central Bank of the South at the time Debtor opened her account.

9. According to Ms. Campbell, a convenience check is a type of advance on a credit card, which may be written for an amount up to the credit limit.

10. At this point in her testimony, Ms. Campbell was being examined about Compass's Exhibit 2, consisting of statements from Debtor's account dating from December 8, 2000 to February 8, 2002. The statements in Exhibit 2 do reflect that, with the exception of the convenience check shown on the May 2001 statement, the monthly AOL charges were the only charges made on the account during that time period. However, the Court wishes to note that the February 2001, June 2001, August 2001, and September 2001 statements are not included in either Compass's Exhibit 2 or in any other exhibit introduced at trial, making it impossible to say conclusively that the Debtor did not incur other charges during these months.

as agents for Xukor. The two traveled to Orange Beach, Alabama in March 2002 to meet with company representatives, and signed a non-compete agreement while there. The Debtor testified that she and her husband were to work on a commission basis, but that they never made any money out of this business. She further testified that many of the charges on the Compass credit card account, including some travel charges, were incurred in connection with this attempted business venture. However, the Debtor acknowledged that not all of the travel charges were business related. After signing the non-compete agreement in Orange Beach, the Debtor and her husband continued on to Florida to visit her husband's aunt and to go to Disney World. The Debtor testified that, although she could not remember the exact amount, she charged approximately $500 on the Compass account at Disney World.

The testimony of the Debtor and of Douglas Corretti reveals that the Debtor suffered some unexpected hardships during the same period of her unemployment and unsuccessful business attempt. In May 2000, the Debtor had entered into a "cost-plus" contract with Homebuilders Unlimited, Inc. (hereinafter, "Homebuilders") for the construction of a new home. Construction loan financing for the project was obtained through First Federal Savings Bank in the amount of $126,000.00. According to the construction contract, Homebuilders would "furnish the materials and perform the labor necessary for the completion" of the house "for the sum of builder's cost, plus fifteen percent," and Homebuilders would directly receive draws from First Federal. (Debtor's Exh. 3). Construction began on the project and, although Homebuilders received draws directly from First Federal, the Debtor discovered that Homebuilders had not paid bills associated with the construction. First Federal agreed to advance more money toward the construction, but insisted that Homebuilders assume responsibility for the liens on the property resulting from its failure to pay the bills.

On May 2, 2001, Mr. Corretti filed for the Debtor a complaint in the Circuit Court of Jefferson County against Homebuilders and others to prevent a "multiplicity of suits" by those suppliers and subcontractors who had supplied goods and services but had gone unpaid by Homebuilders. The case was set for trial in February 2002, but the parties attempted to settle the matter before trial. The proposed settlement would have relieved the Debtor from any liability on debts owed in connection with the construction. The parties negotiated up to and including the trial date in February, at which time all creditors, except for one, expressed a desire to accept the proposal. Because the Debtor had not worked out a deal with all of the creditors, the settlement fell through. Mr. Corretti testified that the parties continued to negotiate but it became apparent in late April of 2002 that a settlement was not possible. At that point, Mr. Corretti recommended that the Debtor file bankruptcy and referred her to another attorney[11] to represent her in the bankruptcy case. No testimony was offered by Compass to contradict Mr. Corretti's testimony.

The Debtor testified that she had not contemplated bankruptcy until Mr. Corretti suggested it when the settlement negotiations collapsed. Although she did not have to make regular monthly mortgage payments to First Federal on the construction loan, she testified that she did

---

11. He testified he referred her to Charles Cleveland, the attorney who filed the chapter 7 petition and defended the Debtor in this adversary proceeding.

make interest payments of $600 to $700 on time each month and made the payments on time. As to the Compass credit card account, she indicated that she always made her minimum payment and believes she never exceeded her credit limit. She admitted that she did not use her card on a consistent basis from month to month, but explained that she would use whatever credit card account had the lowest interest rate at the time, or would decide which account to use based on the statement closing date in order to get the benefit of time before the next payment due date. The Debtor testified that she made no further charges on the Compass account after consulting with her bankruptcy counsel, and on his advice, she stopped making payments to Compass.

The Debtor's credit card statement dated December 8, 2000, shows a balance due of $8,502.67 at that time. (Compass's Exh. 2). The balance due as of the February 8, 2002 statement was $9,134.71. (Compass's Exh. 2). The balance totaled $11,663.95 on March 8, 2002 (Compass's Exh. 3), $13,459.21 on April 8, 2002 (Compass's Exh. 4), and $13,726.48 on May 8, 2002 (Compass's Exh. 5).

Many of the findings of fact necessary to a determination of the dischargeability of a debt involve the intent of the debtor. The determination of intent is to be made in reviewing all of the evidence presented and the credibility of the witnesses. After observing the Debtor's demeanor during testimony, and evaluating what she said in light of all of the other evidence and the testimony of the other witnesses, the Court finds her to be a very credible wit-

ness. She was forthcoming in her answers and did not try to equivocate or be evasive. Her testimony was not directly contradicted by other testimony or any other evidence presented. In fact, her testimony was corroborated by that of Douglas Corretti, whom this Court also finds to be a very credible witness. Mr. Corretti has been an attorney in the Birmingham area for a number of years and has developed an excellent reputation in the legal community.

## II. CONCLUSIONS OF LAW

■■■ Section 523 outlines the exceptions to discharge in bankruptcy proceedings. Exceptions to discharge are to be construed strictly against the objecting creditor in order to give effect to the fresh start policy of the Bankruptcy Code. *Hope v. Walker, (In re Walker)*, 48 F.3d 1161 (11th Cir.1995); *Equitable Bank v. Miller, (In re Miller)*, 39 F.3d 301 (11th Cir.1994). Toward this goal, the objecting creditor bears the burden of proving the elements of nondischargeability by a standard of preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

## A. ACTUAL FRAUD UNDER 11 U.S.C. § 523(a)(2)(A)

■■■ Specifically, § 523(a)(2)(A) provides that a debt for money, property, services, or an extension, renewal, or refinancing of credit will not be discharged to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." [12] In 1983,

12. 11 U.S.C. § 523(a)(2)(A) provides:
 (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
 . . .

 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
 (A) false pretenses, a false representation, or actual fraud, other than a statement re-

the Eleventh Circuit held that under § 17a(2) of the Bankruptcy Act (the predecessor to the present 11 U.S.C. § 523(a)(2)) that

> only after ... clear revocation has been communicated to the cardholder will further use of the card result in liabilities obtained by "false pretenses or false representation" within the meaning of section 17a(2)'s exemption from discharge.

*First Nat'l Bank of Mobile v. Roddenberry*, 701 F.2d 927, 932 (11th Cir.1983). In the instant case, there had been no revocation of the Debtor's right to possession and use of her card prior to the incurrence of the charges in question. Therefore, according to Eleventh Circuit law, the debt was not obtained by false pretenses or false representation.

Section 523(a)(2)(A) also applies to debts for money or property obtained by actual fraud. In *Roddenberry*, the Eleventh Circuit Court noted that the changes to § 17a(2) when it was recodified at 11 U.S.C. § 523(a)(2) "may alter the outcome in certain cases where debtors obtain credit without a present intention of repayment" and that "one commentator suggests that Congress' addition of the term 'actual fraud' to the 'false pretenses and false representation' language of section 17a was intended to eliminate the distinction between overt and implied misrepresentation." *Id.* at 930 n. 3. The court did not express an opinion, at that time, regarding the effect of the additional language. Bankruptcy courts within the

Eleventh Circuit have since held that a credit card debt may still be held to be nondischargeable even if the cardholder's rights were not revoked if there was actual fraud. *See Am. Express Travel Related Servs. Co. v. McKinnon (In re McKinnon)*, 192 B.R. 768 (Bankr.N.D.Ala.1996); *Chase Manhattan Bank v. Ford (In re Ford)*, 186 B.R. 312 (Bankr.N.D.Ga.1995); *Chase Manhattan Bank v. Carpenter (In re Carpenter)*, 53 B.R. 724 (Bankr.N.D.Ga. 1985).

The elements to prove "actual fraud" under § 523(a)(2)(A) are based on the traditional elements of common law fraud. *McKinnon*, 192 B.R. at 771. Thus, to prevail under that section, a creditor must prove that:

(1) the debtor made representations;

(2) at the time, the debtor knew the representations were false;

(3) the debtor made the false representations with the purpose and intention of deceiving the creditor;

(4) the creditor justifiably relied on such representations; and

(5) the creditor sustained a loss as a result of the representations.

*AT & T Universal Card Servs. Corp. v. Reach (In re Reach)*, 225 B.R. 236, 239 (Bankr.N.D.Ala.1997). *See also Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *McKinnon*, 192 B.R. at 771; *Carpenter*, 53 B.R. at 729; *AT & T Universal Card Servs. Corp. v. Reynolds (In re Reynolds)*, 221 B.R. 828, 834 (Bankr.N.D.Ala.1998).[13] The first element

specting the debtor's or an insider's financial condition[.]

**13.** This Court recognizes that the 11th Circuit often phrases the test for actual fraud in terms of the following 4 elements:

(1) the debtor made a false representation with the purpose and intention of deceiving the creditor;

(2) the creditor relied on the representation;

(3) the creditor's reliance was reasonably founded; and

(4) the creditor sustained a loss as a result of the representation.

*Hoffend v. Villa (In re Villa)*, 261 F.3d 1148, 1150 (11th Cir.2001). *E.g., SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th

comes into question in a credit card case because the debtor and the creditor have no actual face-to-face transactions at the time each charge is made or the debts in question are incurred. "Consequentially, the cardholder cannot be said to have directly represented anything to the issuing bank." *Ford,* 186 B.R. at 317.

Some courts have solved this problem by holding that, in using a credit card, a debtor represents that he has the intent and the ability to repay the debt so incurred. *See Signet Bank v. Rawoot (In re Rawoot),* 14 F.3d 596 (4th Cir.1993); *Sun Bank, N.A. v. Stokes (In re Stokes),* 155 B.R. 785 (Bankr.M.D.Fla.1993); *Citibank v. Rodriguez (In re Rodriguez),* 138 B.R. 112 (Bankr.S.D.Fla.1992); *Citicorp Credit Services v. Hinman (In re Hinman),* 120 B.R. 1018 (Bankr.D.N.D.1990). To hold that a debtor is representing that he has the ability to repay the debt which he is charging seems to ignore the very nature of a credit card debt. Many, if not most, consumers use credit cards specifically because they do *not* have the present ability to repay the debt. *See Chase Manhattan Bank v. Murphy (In re Murphy),* 190 B.R. 327, 332 (Bankr.N.D.Ill.1995).

■ Credit card transactions are governed by contractual agreements between the debtors and the card issuers. These agreements typically bind the debtor to repay the debt in at least minimum specified installments over time with interest. In using a credit card, a debtor represents only that he intends to abide by that agreement, and has made a false representation only if, at that time the debt is incurred, he intends to breach his agreement. Therefore, a credit card debt is not nondischargeable for "actual fraud" unless the debtor did not intend to honor the terms of the credit agreement at the time the charges were made or the cash advances were taken. *See McKinnon (In re McKinnon),* 192 B.R. at 768; *Ford (In re Ford),* 186 B.R. at 312; *Carpenter (In re Carpenter),* 53 B.R. at 724.

■ In this case, Compass has not met its burden of proving that the Debtor made representations that she knew were false. The only representations that the Debtor made in using her card were that she would abide by the terms of her credit card agreement. In order to show that these representations were false, Compass would have to show that she did not intend to repay the debt according to the contract terms. As an intent not to repay can rarely be shown by direct evidence, such intent may be inferred from the totality of the circumstances. Some courts have cited a list of twelve factors relevant to the determination of a debtor's intent to repay.[14] These twelve factors were initially

---

Cir.1998); *Fuller v. Johannessen (In re Johannessen),* 76 F.3d 347, 350 (11th Cir.1996); *St. Laurent v. Ambrose (In re St. Laurent),* 991 F.2d 672, 676 (11th Cir.1993). This Court finds that the 4 element test and the 5 element test are substantially the same; however, this Court prefers to use the 5 element test which more easily lends itself to a thorough analysis of actual fraud in the context of dischargeability based upon use of credit cards.

**14.** Those factors are: (1) the length of time between the charges made and the filing of bankruptcy; (2) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (3) the number of charges made; (4) the amount of the charges; (5) the financial condition of the debtor at the time the charges are made; (6) whether the charges were above the credit limit of the account; (7) did the debtor make multiple charges on the same day; (8) whether or not the debtor was employed; (9) the debtor's prospects for employment; (10) the financial sophistication of the debtor; (11) whether there was a sudden change in the debtor's buying habits; and (12) whether the purchases were made for luxuries or necessities. *In re Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988); *Mercantile Bank of Illinois v. Williamson (In re William-*

listed in *Carpenter (In re Carpenter)*, 53 B.R. at 730. In that case, the plaintiff cited those factors in its brief to the court as a compilation of factors which other courts had considered on the issue. *Id.* The court went on to hold, however, that the determination of intent must be made on a case by case basis and the factors listed may or may not be helpful. *Id.*

■ In the instant case a review of all relevant circumstances fails to convince this Court that the Debtor made representations that she knew were false by way of incurring debt with the intent to breach the card agreement. Counsel for Compass points out that within the 90 days preceding the filing date, the Debtor incurred over $4000 of new debt on her Compass account. However, even a brief review of the statements submitted to this Court shows that the Debtor had a cycle of using her card, incurring a balance due of several thousand dollars, paying the balance down, then making new charges.[15] The Debtor may have had an especially vigorous period of credit card activity during the 90 days preceding her bankruptcy, but this activity does not seem completely out of line when compared to her credit card history. Although she used her card quite a bit during this period, she apparently did not exceed her credit limit and she stopped using the card once she consulted with her bankruptcy attorney. The Court cannot infer from these circumstances that the Debtor ran up her credit card account with the intent to breach the credit agreement.

■ Counsel for Compass also argues that the Debtor had a reckless disregard of her financial situation when she made the charges in the months before bankruptcy. Reckless disregard for the truth can constitute a false representation. *Birmingham Trust Nat'l Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985); *Reynolds (In re Reynolds)*, 221 B.R. at 828. In *AT & T Universal Card Services v. Reynolds*, the debtor, who had a monthly social security disability income of $840 per month and had been receiving disability income for over 5 years, exceeded his credit limit of $5000 within 14 days of his first use of his credit card. *Reynolds*, 221 B.R. at 830–31. These charges resulted in the first minimum monthly payment due in the amount of $327.04. *Id.* at 839. The debtor testified at trial that he had intended to make the payment from both rent he had expected to receive and reimbursement from his girlfriend of charges that she had made on the account. *Id.* However, the court held that the debtor's "reliance upon such speculative financial arrangements appears to be a reckless disregard of the truth of his ability to make the minimum monthly payments," thus satisfying the second element of fraud. *Id.*

Compass has not convinced this Court by a preponderance of the evidence that the Debtor acted with the requisite reckless disregard to her financial situation to constitute a false representation under § 523(a)(2)(A). During the 90 day period that the Debtor incurred over $4000 of charges on her account, she was unem-

---

son), 181 B.R. 403 (Bankr.W.D.Mo.1995); *FCC Nat'l Bank/First Card v. Friend (In re Friend)*, 156 B.R. 257 (Bankr.W.D.Mo.1993).

15. A few examples of the Debtor's up-again, down-again Compass credit card balance:

| Statement Date | Balance Due |
|---|---|
| 10/07/96 | $ 842.18 |
| 05/09/97 | $ 5,355.64 |
| 01/08/98 | $ 8,921.61 |
| 06/03/98 | $ 1,088.94 |
| 07/08/99 | $ 21.95 |
| 03/08/00 | $ 4,266.54 |
| 04/08/00 | $ 504.37 |
| 11/08/00 | $ 8,639.07 |
| 05/08/01 | $10,352.72 |
| 05/08/02 | $13,726.48 |

Debtor's Exh. 6.

ployed and received income in the amount of $823 per month, although she was trying to generate other income by starting her own business and by sending out resumes. This is not reliance on speculative financial arrangements to the same degree as found in *Reynolds*. The Debtor's resume and social security earnings statement taken in conjunction show that, although she changed jobs on a fairly frequent basis from 1992 to the present, her income stayed within the mid-$30,000 to lower-$40,000 range the majority of the time.[16] (Debtor's Exhs. 1 and 2). This Court cannot conclude the Debtor's expectation that she would again be employed earning income within this same range was in reckless disregard of her financial situation. Further, this Court must acknowledge that she was able to pay the minimum payments required because she **did** in fact pay all of the minimum payments required until the payment due May 3, 2002.[17] The Debtor's uncontroverted testimony establishes that she was prepared to make this payment until her bankruptcy attorney advised her not to do so. Further, the Debtor did not make any charges after April 25, 2002. Mr. Corretti testified that he realized in late April that there was no hope of settling the lawsuit against Homebuilders. It was at that point that he recommended the Debtor consult a bankruptcy attorney. The Debtor testified that she had not considered bankruptcy until Mr. Corretti mentioned it and shortly thereafter consulted Mr. Cleveland. She did as Mr.

Cleveland advised and made no further charges or payments. The Court concludes that the Debtor did not make any charges on her card, and thus did not make any representations to Compass whatsoever, once she realized that bankruptcy was a possibility. Therefore, Compass has not met its burden of proving that the Debtor recklessly disregarded her financial situation to the extent that would constitute false representations.

Compass has also not proven by a preponderance of the evidence the third element of fraud—the intent to deceive. Compass has not presented any evidence, direct or otherwise, indicating that at the time the Debtor made charges that she did not intend to make the minimum monthly payments. She did pay the minimum required every month until the payment due May 3, 2002. Her testimony, substantiated by Mr. Corretti, is that she had not considered bankruptcy until the settlement negotiations fell through. There is no evidence before the Court showing that the Debtor acted with any intent to deceive.

The fourth element at issue in the fraud analysis under § 523(a)(2)(A) is whether the creditor justifiably relied on the debtor's false representations. Justifiable reliance is the "intermediate level of reliance between the lower, objective 'actual reliance' and the higher subjective 'reasonable reliance.'" *Reynolds*, 221 B.R. at 834 (citing *Field*, 516 U.S. at 71, 116 S.Ct. at 444). Typically, "justifiable reliance

---

16. The Debtor's yearly income from 1992 to 2001 as compiled by the Social Security Administration is as follows:

| | |
|---|---|
| 1992 | $52,908 |
| 1993 | $39,275 |
| 1994 | $37,690 |
| 1995 | $36,334 |
| 1996 | $ 343 |
| 1997 | $15,645 |
| 1998 | $30,197 |
| 1999 | $38,147 |
| 2000 | $38,170 |
| 2001 | $41,984 |

Debtor's Exh. 2.

17. This is according to the credit card statements presented into evidence for the period December 2000 to May 2002. (Compass's Exhs. 2–5; Debtor's Exh. 6). As already noted, the Court does not have a complete set of statements for this period.

862

permits a plaintiff to rely unequivocally on a representation or promise made by a debtor, without investigating or acting reasonably to determine the truth of the representation or promise, unless the statement is patently false." *FCC National Bank v. Gilmore,* 221 B.R. 864, 874 n. 10 (Bankr.N.D.Ala.1998). In other words, the creditor's reliance will likely be justified if there is nothing on the face of the representation that would lead the creditor to believe that the representation is false, or if the creditor does not have actual knowledge from which he should realize the representation is false at the time it is made. *See id.* Nevertheless, with regard to credit card use, the justifiable reliance element is not as simple to meet as it would seem at first glance. To satisfy the fourth element, the creditor must show only that its reliance on a debtor's representations is justified; however, *there must be evidence that the creditor did in fact rely on the representation. Id.* Thus, the first inquiry must necessarily be whether there was reliance at all. Only after the creditor demonstrates that there has been reliance does justifiability come into play. In determining whether reliance is justified, the attributes of the particular creditor must be taken into account. *See Reynolds,* 221 B.R. at 836; *see also Bropson v. Thomas (In re Bropson),* 217 B.R. 650, 653–54 (Bankr.M.D.Fla.1998). What is considered a "justifiable reliance" for one creditor could be completely unjustified as to another creditor in a similar situation. As explained by the United States Supreme Court in *Field v. Mans:*

> Justifiability is not without some limits, however. As a comment to § 541 [of the Restatement (Second) of Torts] explains, a person is
>
>> "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had

utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses." [Restatement (Second) of Torts (1976)], § 541, Comment a.

> A missing eye in a "sound" horse is one thing; long teeth in a "young" one, perhaps, another.

> Similarly, the edition of Prosser's Law of Torts available in 1978 (as well as its current successor) states that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that "[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is require to make and investigation of his own." W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971).

*Field,* 516 U.S. at 71, 116 S.Ct. at 444.

Extensions of credit by way of a credit card account are unlike other extensions of credit such as financing an automobile or making small, unsecured personal loans. It is the nature of credit card use for the

card holder to incur charges, make monthly payments, then incur more charges without making any other contact with the credit card issuer. Unlike a typical car loan which lasts not more than an average of 5 years, a credit card account may stay open for unlimited years unless something, such as payment defaults, triggers the card issuer to modify or close the account.

▉▉▉ The credit card industry is a big business. Those banks and companies who issue credit cards generally extend credit to thousands and thousands of customers; with this kind of volume, credit card issuers frequently experience payment defaults or bankruptcies by their cardholders. Credit card issuers are sophisticated business operations who should know that card holders sometimes use their cards when there is little likelihood that the debt can be repaid. They also know that some card holders may become unemployed, underemployed, disabled, or suffer other financial hardships while still having the use of their card. Yet, issuers often extend credit to consumers without performing any kind of credit check, and increase credit limits based on past payment performance without an investigation into whether the card holder's income, debt level, or other circumstances have changed since the original extension of credit. Given the nature of the credit card industry and the ease with which a card issuer can check an applicant's credit, credit card issuers have an obligation to perform at least minimal investigation into a card applicant's financial situation before extending or increasing credit; otherwise, it will be difficult to find that a credit card issuer relied on anything when extending credit. Furthermore, without at least minimal investigation, any reliance that is shown on the debtor's implied representations that he or she intends to honor the credit card agreement will not be justified.

▉▉ Ms. Campbell testified that she believes a credit check was performed at the time the Debtor's credit card account was opened in 1985. Throughout the years, the Debtor's credit limit was increased up to a limit of $14,900 at the time she filed for bankruptcy. Ms. Campbell testified that the Compass system automatically increases credit limits for those customers who have a good payment history. At the time the Debtor opened her Compass account, she made $45,000 per year. (Compass's Exh. 1). From 1985 until she filed bankruptcy in 2002 (a 17 year time-span), the Debtor's income was over $45,000 per year only once, in 1992. (Debtor's Exh. 2). So, even though the Debtor had not received any significant salary increases over the years, she did enjoy significant credit line increases. Compass last increased her credit limit by $1,500 just months before the bankruptcy filing date. Had Compass checked the Debtor's credit report, it would likely have discovered that she was unemployed at that time, that her pre-unemployment salary was similar to what she earned in 1985, that she had amassed a fairly significant total amount of credit card debt, and that she had taken out a construction loan. Compass apparently did not investigate this possibility, but blindly increased the Debtor's credit limit based only on her payment history. Any reliance by Compass on the implied representations made by the Debtor is unjustified, since even a cursory examination of her credit history would have revealed her actual financial situation.

▉▉ The last element to be proven in fraud analysis is that the creditor's loss resulted from the debtor's false representations. The Debtor represented to Compass only that she would abide by her credit card agreement and pay at least the minimum amount due each month. Her

uncontroverted testimony is that she had made these minimum payments and was prepared to continue until advised by her attorney to stop. Further, she testified that she had not even considered bankruptcy until the collapse of the settlement negotiations concerning the house construction disaster. This Court finds that Compass suffered a loss not because of any representations, false or otherwise, that the Debtor made, but because of her catastrophic financial condition precipitated by the disastrous house construction project.

Compass has not proven by a preponderance of the evidence any of the elements required for this Court to find that the Debtor committed actual fraud through the use of her credit card. The debt owed to Compass is not nondischargeable under § 523(a)(2)(A).

## B. PRESUMPTION OF NONDISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(2)(C)

 Counsel for Compass has argued that the Debtor's frequent use of her card and incurring over $4000 of new indebtedness within the months before the filing date invokes the presumption of nondischargeability found in § 523(a)(2)(C). This section provides:

> (C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,150 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,150 that are extensions of consumer credit

under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act[.]

11 U.S.C. § 523(a)(2)(C). According to legislative history, this subsection was enacted "to prevent 'loading up' or credit buying sprees" by those contemplating bankruptcy. *John Deere Community Credit Union v. Feddersen (In re Feddersen)*, 270 B.R. 733, 736 (Bankr.N.D.Iowa 2001); *Bank One Lafayette, N.A. v. Larisey (In re Larisey)*, 185 B.R. 877, 880 (Bankr.M.D.Fla.1995). While normally the burden of proving fraud under § 523(a)(2) rests with the plaintiff creditor, § 523(a)(2)(C) creates a presumption of fraud, shifting the burden to the defendant debtor to bring forth evidence rebutting the presumption. *Am. Express Travel Related Servs. Co. v. Tabar (In re Tabar)*, 220 B.R. 701, 704 (Bankr.M.D.Fla.1998). A creditor will receive the benefit of this presumption only if all of the § 523(a)(2)(C) requirements are met.[18]

 First, the debt incurred must be consumer debt. 11 U.S.C. § 101(8) defines a "consumer debt" as a "debt incurred by an individual primarily for a personal, family, or household purpose[.]" In other words, " '[i]f the credit transaction involves a profit motive, then it is not a consumer

---

18. Counsel for Compass argued at trial that the Debtor's purchases within the months before her bankruptcy invoked the nondischargeability presumption of § 523(a)(2)(C). Counsel did not indicate or argue that the Debtor had received any cash advances from Compass which would invoke the preference presumption; thus, the Court declines to address the portion of the subsection dealing with cash advances.

debt. On the other hand, if a debt does not involve a business transaction or potential profit motive, then the debt is ordinarily considered a consumer debt.'" *Feddersen,* 270 B.R. at 736 (*quoting In re Palmer,* 117 B.R. 443, 446 (Bankr. N.D.Iowa 1990)).

Not all consumer debts fall within the ambit of § 523(a)(2)(C). It applies only to those debts incurred for "luxury goods or services." Section 523(a)(2)(C) does not define what "luxury goods and services" are, but it defines what they are not: " 'luxury goods or services' do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor." 11 U.S.C. § 523(a)(2)(C). Considerations bearing upon whether or not an item is a luxury good include the circumstances surrounding the purchase, whether the item serves a significant family function, and whether the purchase shows financial irresponsibility. *General Motors Acceptance Corp. v. McDonald (In re McDonald),* 129 B.R. 279, 282–83 (Bankr.M.D.Fla.1991). "Purchases that are extravagant, indulgent, or nonessential under the circumstances are considered luxury goods." *Id.* at 283.

Even if the subject debts were incurred for luxury goods or services, the presumption will not apply unless the debt amount owed to one creditor and attribut-able to such goods or services is over $1,150. *Gilmore,* 221 B.R. at 880 n. 20 (noting that the presumption of § 523(a)(2)(C) did not apply because, although the debtor owed more than the statutory threshold amount to one creditor, the portion of the debt attributable to luxury goods and services was less than the statutorily required amount). Finally, any debt which would otherwise be eligible for the § 523(a)(2)(C) presumption must have been incurred within the 60–day period before the bankruptcy filing date. 11 U.S.C. § 523(a)(2)(C).

Within the 60 days before filing for bankruptcy, the Debtor charged $1934.48 [19] of goods and services on her Compass credit card account. The Debtor testified, and the April and May credit card statements appear to corroborate, that many of these charges are attributable to the Debtor's business venture with Xukor Services.[20] The charges relating to the business were incurred with a profit motive and are not considered consumer debts; thus, these charges do not fall within § 523(a)(2)(C). The remaining charges reflected on the Debtor's credit card statements are for consumer debts, but they can hardly be described as "luxurious." Most of the Debtor's consumer charges were made at gas stations, grocery stores, department stores, a pharmacy, and restaurants. Gas, groceries, and pharmaceutical items fall squarely within statutorily

---

19. The $1934.48 amount was determined by adding all of the charges on the Debtor's April and May credit card statements (Compass's Exhs. 4 and 5) with a transaction date of March 10, 2002 or later, with two exceptions. First, the April statement shows a charge of $1,260.96 at CompUSA on March 21, and a credit of $1,201.58 from CompUSA on March 22. The difference of $59.38 between the charge and the credit was added to the total amount of charges made within the 60 day period. Second, the May statement reflects a $29.00 late fee assessed against the Debtor, which was not added to the total of charges made.

20. Charges appearing to relate to the business venture include charges at the Sleep Inn Hotel in Orange Beach, Alabama, Staples (an office supply store), Kinko's (a copying service), Doteasy Technology, and for some type of investigative alliance. This Court cannot say for certain that these specific charges were business-related; however, even if these charges are consumer debts, they do not appear to be for luxury goods or services.

defined exception to luxury goods, as they are items attributable to the debtor's support or maintenance. The Debtor's restaurant bills fall within this category as well.[21] As to certain other charges on the account, this Court has no way to determine whether the charges were for items of necessity or luxury. No testimony or other evidence before the Court details the transactions the Debtor made at McRae's, Wal–Mart, Sears, J.C. Penney, or American Heritage Carpet for a total amount of $337.31. Without evidence otherwise, the Court cannot assume that these charges were made for luxury goods or services.[22] The Debtor did make one charge within the relevant time period which this Court finds to be of a luxurious nature, which is the $587.41 charge for Disney World made on March 13, 2002.[23] However, this charge is well below the $1,150 threshold amount required in § 523(a)(2)(C), and no other charge made within the relevant time period appears to have been made for a luxury good or service. Even if, for the sake of argument, the Court combines the Disney World charge of $587.41 with the $337.31 of charges made at department-type stores, the total amount that could possibly be attributable to luxury goods and services is $924.72, still below the § 523(a)(2)(C) threshold. Counsel for Compass indicated at trial that the Debtor made over $4000 of charges shortly before the bankruptcy filing date, but that some of these charges were made outside of the 60 day period. For purposes of § 523(a)(2)(C), this Court cannot consider any charges outside the 60 day period. The Debtor could have charged thousands of dollars of luxury goods and services on the 61st day preceding the filing date, but it would make no difference with regard to § 523(a)(2)(C). The statute is clear regarding the relevant time period.[24] Because Compass has not shown that the Debtor incurred consumer debts of more than $1,150 for luxury goods or services within the 60 day period before her bankruptcy filing, Compass cannot benefit from the § 523(a)(2)(C) presumption of nondischargeability.

### III. CONCLUSION

A review of all relevant circumstances fails to convince this Court that the Debtor acted in a fraudulent manner when she used her Compass credit card. The only representation she made when using her card was that she would abide by the credit card agreement and would make her

21. This Court would have been extremely reluctant to hold that the Debtor's restaurant bills were not luxurious had the Debtor frequented expensive, up-scale restaurants, but she did not. Within the relevant 60 day period, the Debtor incurred 3 restaurant charges on her Compass account in the amounts of $40.00, $66.00, and $56.00. These charges are neither extravagant nor exorbitant, were not incurred on a frequent basis, and do not indicate financially irresponsibility.

22. Within the 60 day period, the Debtor spent $60.44 at McRae's, $53.96 at Wal–Mart, $106.92 at Sears, and $57.99 at J.C. Penney. At stores such as these, charges could be made for anything from clothing to automobile repair to fine china or other collectibles. The Court does not have the necessary information before it to determine if the charges at these stores were made for necessities or luxuries. The same could be said for the charge of $58.00 at American Heritage Carpet. In order to benefit from the § 523(a)(2)(C) presumption, the creditor has the burden of demonstrating to the Court that the debt was incurred for luxury goods or services. The Court will not make such a finding unless sufficient evidence is before the Court, or it is patently obvious on the face of the charge.

23. The actual entry on the April 8, 2002 statement is for "POLYNESIAN FRONT DESK LK BUENA VI FL." (Compass's Exh. 4).

24. Of course, such charges could be very relevant under other bankruptcy code sections.

minimum monthly payments. The Court does not find that these representations were false, as her testimony establishes that she did intend to make the monthly payments at the time she made the charges. The Debtor did in fact abide by her agreement until such time that her bankruptcy attorney advised her to do otherwise. She had no intentions of filing bankruptcy until her civil attorney suggested it, and once that suggestion was made, she stopped using her Compass card; thus, she did not incur charges on the account with the intention of filing for bankruptcy. Further, this Court cannot conclude that the Debtor acted with reckless disregard for her financial situation, as she somehow managed to make her minimum monthly payments even during her period of unemployment, and took active steps during this time to produce more income. Even if the Debtor had intended to breach her credit card agreement at the time she used her card, Compass has not shown justifiable reliance on her representations that she would abide by the credit card agreement. Compass extended more and more credit to the Debtor throughout the years, yet apparently never checked her credit history after the account was initially opened. Compass has also not established the causal connection between its loss and the Debtor's representations. Certainly, Compass will suffer a loss as the Debtor is no longer making payments on her credit card account; however, Compass's loss results from her financial catastrophe resulting from the home construction project, not from any false representations made by the Debtor. Finally, Compass is not entitled to the presumption of nondischargeability in § 523(a)(2)(C), as it has not shown the Debtor incurred more than $1,150 of consumer debt for luxury items within the 60 day period preceding the bankruptcy filing. Compass has not prov-

en its case under § 523(a)(2)(A), and is not entitled to the presumption of § 523(a)(2)(C). A judgment for the Debtor is due to be entered. Accordingly, it is hereby

**ORDERED, ADJUDGED, AND DE-CREED** that the relief sought by the Plaintiff, Compass Bank, to declare certain indebtedness of the Debtor, Barbara Jean Meyer, nondischargeable in accordance with 11 U.S.C. § 523 is **DENIED.** It is further

**ORDERED, ADJUDGED, AND DE-CREED** that the indebtedness of the Debtor, Barbara Jean Meyer, to Compass Bank is **DISCHARGEABLE** and is included in the discharge of the Debtor entered in this case by order of this Court on December 3, 2002 and a **JUDGMENT** to that effect in favor of the Debtor, Barbara Jean Meyer, will be entered contemporaneously herewith.

### JUDGMENT

In conformity with the Memorandum Opinion and Order entered contemporaneously herewith, it is

**ORDERED, ADJUDGED, AND DE-CREED** that the relief sought by the Plaintiff, Compass Bank, to declare certain indebtedness of the Debtor, Barbara Jeanne Meyer, nondischargeable in accordance with 11 U.S.C. § 523(a)(2) is **DENIED.** It is further

**ORDERED, ADJUDGED, AND DE-CREED** that the indebtedness of the Debtor, Barbara Jeanne Meyer, to AT & T Universal Card Services Corporation is **DISCHARGEABLE** and is included in the discharge of the Debtor entered in this case by order of this Court on December 3, 2002 and a **JUDGMENT** to that effect

in favor of the Debtor, Barbara Jeanne Meyer, is hereby entered.